**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SENECA MORTGAGE SERVICING LLC, | Case No. 1:26-cv-02300 |
| Plaintiff, | |
| -against- | |
| HOMESPIRE MORTGAGE CORPORATION, | |
| Defendant. | |

<u>**COMPLAINT**</u>

Plaintiff Seneca Mortgage Servicing LLC ("Seneca") files this Complaint against Defendant Homespire Mortgage Corporation ("Homespire") stating as follows:

<u>**NATURE OF THE ACTION**</u>

1. This breach of contract action arises from Homespire's failure to honor its reimbursement obligations under a Bulk Servicing Rights Purchase and Sale Agreement dated November 30, 2022 (the "Agreement").

2. Fannie Mae required Seneca to repurchase a mortgage loan due to a defect attributable to Homespire. Knowing its reimbursement obligations, Homespire acknowledged its liability and agreed to fund the repurchase. However, Homespire failed to remit payment.

3. As a result, Seneca advanced its own funds to satisfy the Fannie Mae claim and now seeks contractual damages of $376,147.06, plus interest, attorneys' fees, and costs.

<u>**PARTIES**</u>

4. Seneca is a Delaware limited liability company with a principal place of business in Connecticut, whose sole member is Senecca Mortgage Investments LP, a Delaware limited partnership, whose partners are citizens of Connecticut.

5.    Homespire is a Maryland corporation with its principal place of business in Maryland.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.    Seneca is a citizen of Connecticut, inclusive of the partners of its sole member.

8.    Homespire is a citizen of Maryland, which is its state of incorporation and the location of its principal place of business.

9.    This Court has personal jurisdiction over Homespire pursuant to Section 8.01 of the Agreement, which is governed by New York law, and which provides for exclusive jurisdiction in the state of New York.

10.    Venue is proper in this District under 28 U.S.C. § 1391 and Section 8.01 of the Agreement, which provides that "any dispute arising under or relating to this Agreement shall be brought in and will be resolved exclusively in either United States District Court for the Southern District of New York or in the Supreme Court of the State of New York, County of New York."

## FACTUAL ALLEGATIONS

*The Agreement*

11.    On November 30, 2022, Seneca and Homespire entered into the Agreement, whereby Seneca purchased certain mortgage servicing rights from Homespire for residential mortgage loans owned by Fannie Mae or Freddie Mac. The Agreement is attached as Ex. A.

12.    Seneca fully performed its obligations under the Agreement, including the payment of all required purchase price amounts, advances, and holdbacks.

2

*Homespire's Repurchase Obligations*

13.     Per Section 6.04(a) of the Agreement, if Seneca "is required by an Agency to repurchase a Mortgage Loan or to make such Agency whole due to an Excluded Obligation or a Defect in such Mortgage Loan," Seneca shall notify Homespire, and Homespire "shall either remit necessary amounts directly to the applicable Agency, or pay to Purchaser, by wire transfer of immediately available funds, the sum of the related repurchase or make-whole price."

14.     Section 6.04(a) further provides that "Purchaser [Seneca] shall not be required to advance any of its own funds to pay any portion of any repurchase or make-whole price."

15.     Section 6.04(f) states that "[t]he obligations of Seller and Purchaser under this Section 6.04 shall survive for the life of the related Mortgage Loans."

*The Fannie Mae Repurchase Demand*

16.     On July 1, 2025, Fannie Mae issued a putback notice requiring Seneca to repurchase a mortgage loan due to a defect or excluded obligation attributable to Homespire.

17.     The repurchase amount demanded by Fannie Mae totaled $376,147.06.

18.     On July 9, 2025, Seneca promptly notified Homespire of the Fannie Mae repurchase demand in accordance with Section 6.04(a).

19.     On July 10, 2025, Homespire acknowledged receipt of Seneca's notice.

20.     On August 26, 2025, Homespire agreed that it was obligated to fund the repurchase amount.

*Homespire's Breach*

21.     Despite acknowledging its obligation and committing to fund the repurchase, Homespire failed to remit the funds to Fannie Mae or Seneca.

3

22.    As a result, Seneca was forced to advance its own funds to satisfy the Fannie Mae demand and maintain its standing with the Agency.

23.    On November 26, 2025, Seneca paid Fannie Mae the full repurchase amount of $376,147.06.

24.    On December 16, 2025, Seneca sent Homespire a formal written demand for reimbursement.

25.    Homespire has failed and refused to reimburse Seneca, which constitutes a material breach of the Agreement, including Section 6.04 and Article VI.

## COUNT ONE

### Breach of Contract

26.    Seneca realleges and incorporates by reference paragraphs 1 through 25.

27.    The Agreement is a valid and binding contract between Seneca and Homespire governed by New York law.

28.    Seneca fully performed its obligations under the Agreement.

29.    Homespire materially breached the Agreement by failing to reimburse Seneca for the Fannie Mae repurchase payment despite its express contractual obligation to do so and its acknowledgment of that obligation.

30.    As a direct and proximate result of Homespire's breach, Seneca has suffered damages in the principal amount of $376,147.06.

31.    Seneca is entitled to prejudgment interest. Section 6.04(a) provides that amounts owed "will incur interest at an annual rate of the Prime Rate plus five percent (5.00%)."

4

32.     Seneca is entitled to recover its attorneys' fees and costs. Per Section 7.06 of the Agreement, "the prevailing party in such action shall . . . be entitled to judgment for reasonable attorneys' fees incurred by reason of such action and all out of pocket costs of suit."

## PRAYER FOR RELIEF

WHEREFORE, Seneca respectfully requests that this Court enter judgment in its favor and against Defendant Homespire Mortgage Corporation as follows:

A.     Compensatory damages in the principal amount of $376,147.06;

B.     Prejudgment interest at the contractual rate of Prime Rate plus 5% per annum from November 26, 2025 through the date of judgment;

C.     Attorneys' fees and costs of suit pursuant to Section 7.06 of the Agreement;

D.     Post-judgment interest at the maximum rate permitted by law; and

E.     Such other and further relief as the Court deems just and proper.

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

By:     */s/ Kenneth E. Chase*
Kenneth E. Chase
S.D.N.Y. Bar No. kc4200
Chase Law & Associates, P.A.
951 Yamato Road, Suite 280
Boca Raton, FL 33431
Tel: (305) 402-9800
Fax: (305) 402-2725
Email: kchase@chaselaw.com

*Attorneys for Plaintiff*
*Seneca Mortgage Servicing LLC*

# EXHIBIT A

**EXECUTION VERSION**

**BULK SERVICING RIGHTS
PURCHASE AND SALE AGREEMENT**

Dated as of November 30, 2022,

By and Between

SENECA MORTGAGE SERVICING LLC, as Purchaser,

and

Homespire Mortgage, as Seller

118565008\V-2

**Table of Contents**

**Page**

ARTICLE I DEFINITIONS ...................................................................................................1

      Section 1.01    Defined Terms ...............................................................................1

ARTICLE II SALE AND CONVEYANCE OF SERVICING RIGHTS ....................................8

      Section 2.01    Agreement to Sell the Servicing Rights ........................................8

      Section 2.02    Purchase Price ..............................................................................9

      Section 2.03    Closing Conditions ......................................................................12

ARTICLE III REPRESENTATIONS, WARRANTIES, AND COVENANTS .........................13

      Section 3.01    Representations and Warranties and Covenants with respect to the Servicing Rights .....................................................................13

      Section 3.02    Representations, Warranties and Covenants of Seller ...............21

      Section 3.03    Representations, Warranties and Covenants of Purchaser ........23

      Section 3.04    Discovery and Notice of Breach ..................................................24

ARTICLE IV SALE DATE AND TRANSFER DATE DELIVERIES ....................................25

      Section 4.01    Documents, Schedules and Exhibits Required on or Prior to each Sale Date ..............................................................................25

      Section 4.02    Documents, Schedules and Exhibits Required With Respect to each Transfer Date .......................................................................25

      Section 4.03    Access to Information ..................................................................27

      Section 4.04    Further Assurances.....................................................................27

      Section 4.05    Transfer Expenses ......................................................................28

      Section 4.06    Quality Control Reviews...............................................................28

      Section 4.07    Cooperation.................................................................................28

      Section 4.08    Financial Statements ..................................................................29

      Section 4.09    Notices .......................................................................................29

ARTICLE V ADMINISTRATION OF TRANSFER OF SERVICING ..................................30

      Section 5.01    Interim Servicing ........................................................................30

      Section 5.02    Notice Letters of Transfer. ..........................................................30

      Section 5.03    Statements. ................................................................................30

      Section 5.04    Tax and Flood Contracts.............................................................31

      Section 5.05    Transfer of Custodial and Escrow Accounts................................31

i

Section 5.06    Payment of Advances. .................................................................................31

Section 5.07    Payments and Notices Received By Seller. ....................................................31

Section 5.08    Possession of Documents and Funds Following the Sale Date; Limitations on Interim Servicing. ......................................................................................32

ARTICLE VI REMEDIES ..................................................................................................32

Section 6.01    Seller Indemnification..................................................................................32

Section 6.02    Purchaser Indemnification ..........................................................................33

Section 6.03    Refunds and Reimbursements ....................................................................33

Section 6.04    Repurchases, Make-Whole Payments and Compensatory Fees......................34

Section 6.05    Purchaser Due Diligence and Subsequent Rejection.....................................36

ARTICLE VII ADDITIONAL AGREEMENTS...................................................................37

Section 7.01    Publicity .....................................................................................................37

Section 7.02    Assignment .................................................................................................37

Section 7.03    Entire Agreement ........................................................................................37

Section 7.04    Amendments, Changes and Modifications ...................................................37

Section 7.05    Severability.................................................................................................38

Section 7.06    Attorney's Fees ..........................................................................................38

Section 7.07    No Partnership ...........................................................................................38

Section 7.08    Records ......................................................................................................38

ARTICLE VIII MISCELLANEOUS PROVISIONS ...........................................................38

Section 8.01    Waiver of Jury Trial, Venue; Governing Law ..............................................38

Section 8.02    Notices .......................................................................................................39

Section 8.03    Exhibits......................................................................................................39

Section 8.04    General Interpretive Principles.....................................................................39

Section 8.05    Reproduction of Documents ........................................................................40

Section 8.06    Solicitation.................................................................................................40

Section 8.07    Counterparts ...............................................................................................41

118565008\V-2

EXHIBITS

EXHIBIT 1-A      MORTGAGE FILE
EXHIBIT 1-B      CUSTODIAL FILE
EXHIBIT 2        CONTENTS OF MORTGAGE LOAN SCHEDULE
EXHIBIT 3        SENECA PORTFOLIO CHARACTERISTICS
EXHIBIT 4        FORM OF LIMITED POWER OF ATTORNEY
EXHIBIT 5        FORM OF BILL OF SALE
EXHIBIT 6        INTERIM SERVICING AGREEMENT
EXHIBIT 7        TRANSFER INSTRUCTIONS

iii

118565008\V-2

**BULK SERVICING RIGHTS PURCHASE AND SALE AGREEMENT**

This **BULK SERVICING RIGHTS PURCHASE AND SALE AGREEMENT** (as the same may be amended, restated, modified, substituted or extended from time to time, this "Agreement") is made as of November 30, 2022 (the "Effective Date"), and is executed by and between Homespire Mortgage, a Maryland corporation (the "Seller"), and Seneca Mortgage Servicing LLC, a Delaware limited liability company (the "Purchaser").

PRELIMINARY STATEMENT

Seller and Purchaser wish to provide for the terms and conditions relating to the sale and purchase on each Sale Date (as defined below), of all of Seller's right, title and interest in and to the related Servicing Rights (as defined below), and the assumption by Purchaser, of certain of Seller's duties, obligations, rights and liabilities under and relating thereto (as more fully described herein), for all of the related Mortgage Loans (as defined below) having the characteristics set forth in the related Mortgage Loan Schedule (as defined below), together with all related Escrow Funds (as defined below) and accounts, contract rights, incidental income and benefits, and servicing files and records including, without limitation, Mortgagor lists and insurance coverage, related to the servicing of such Mortgage Loans, all as more particularly set forth herein; provided, however, that Purchaser shall not assume any Excluded Obligations (as defined below).

In consideration of the mutual agreements hereinafter set forth, Seller and Purchaser hereby agree as follows:

ARTICLE I
DEFINITIONS

Section 1.01    Defined Terms.    Whenever used in this Agreement, the following words and phrases shall have the following meanings specified in this Article:

"Accepted Servicing Practices": With respect to each Mortgage Loan, the mortgage servicing practices that are in compliance with (i) the applicable Agency Contract, including the related Agency Requirements, (ii) all applicable federal, state and local laws and regulations, (iii) the terms of the related Mortgage and Mortgage Note, and (iv) to the extent not in conflict with the preceding clauses (i), (ii) and (iii), the accepted mortgage servicing practices of prudent mortgage lending institutions which service mortgage loans of the same type as such Mortgage Loan in the jurisdiction where the related Mortgaged Property is located.

"Advance": With respect to the servicing of a Mortgage Loan and the related Servicing Rights, any amounts required to be advanced in accordance with the terms of the Agency Contract and Accepted Servicing Practices in connection with the payment of taxes and insurance, the payment of corporate advances, advances of principal and interest in connection with delinquent Monthly Payments, or advances or otherwise made with respect to such Mortgage Loan in accordance with the Agency Requirements and Accepted Servicing Practices applicable to such Mortgage Loan, and reimbursable in accordance with such Agency Requirements.

"Advances Purchase Price": The meaning set forth in Section 2.02.

"Affiliate": With respect to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person.  As used in this definition, the term "control" (including the two terms "controlled by" and "under common control with")

means the possession, directly or indirectly, of the power to direct or cause the direction of management or policies of the specified Person, whether through the ownership of voting securities, by contract or otherwise.

"Agency": As applicable to the context in which such term is used herein relating to the sale or servicing of the Mortgage Loans, either individually, Fannie Mae or Freddie Mac, or collectively, both Fannie Mae and Freddie Mac.

"Agency Contract": With respect to each of Seller and Purchaser, the contractual arrangement between the applicable Agency and Seller or Purchaser, respectively, which includes the Agency Requirements.

"Agency Guides": As applicable to the context in which such term is used herein and with respect to whether a Mortgage Loan has been sold and conveyed to either Fannie Mae or Freddie Mac, the Fannie Mae Guides or the Freddie Mac Guides, respectively.

"Agency Requirements": As applicable to the Mortgage Loans, the applicable rules, regulations, announcements, notices, and instructions of the respective Agency, which in the case of each Agency includes, without limitation, the respective Agency Guides.

"Agreement": This Bulk Servicing Rights Purchase and Sale Agreement including all schedules, exhibits, amendments, restatements, modifications, supplements, substitutions and/or extensions thereto and/or thereof from time to time.

"Applicable Requirements": As of the time of reference and as applicable, (i) all contractual obligations of Purchaser, Seller, any Originator and any Prior Servicers with respect to the applicable Servicing Rights, including without limitation those contractual obligations contained herein, in any applicable servicing agreements or in the Mortgage Loan Documents for which Purchaser, Seller, any Originator, or any Prior Servicer, is responsible or at any time was responsible; (ii) all applicable federal, state and local laws, statutes, rules, regulations and ordinances applicable to Purchaser, Seller, any Originator and any Prior Servicers, or to the Servicing Rights or the origination, purchase, sale, enforcement, servicing, pooling or securitization, or filing of claims in connection with, the related Mortgage Loans, including the requirements of any governmental agency, board, commission, instrumentality or other governmental or quasi-governmental body or office; (iii) the Agency Requirements, and the requirements and guidelines of any Agency applicable to Purchaser, Seller, any Originator and any Prior Servicers, or to the Servicing Rights or the origination, purchase, sale, enforcement, servicing, pooling or securitization, or filing of claims in connection with, the related Mortgage Loans; and (iv) all other judicial and administrative judgments, orders, stipulations, awards, writs and injunctions applicable to Purchaser, Seller, any Originator, any Prior Servicer, the applicable Servicing Rights or the related Mortgage Loans.

"Assignment": An assignment of a Mortgage, notice of transfer or equivalent instrument, in form acceptable for recording and sufficient under the laws of the jurisdiction wherein the Mortgaged Property is located to reflect of record the transfer of the Mortgage.

"Bankruptcy Event": With respect to any Mortgage Loan, a Mortgage Loan or the related Mortgagor becomes subject to a bankruptcy proceeding.

118565008\V-2

"<u>Bill of Sale</u>": A document delivered by Seller to Purchaser on each Sale Date in the form of **Exhibit 4** attached hereto with respect to the sale of Servicing Rights related to the Mortgage Loans identified on <u>Schedule A</u> to the Bill of Sale.

"<u>Business Day</u>": A day of the week other than (a) Saturday, (b) Sunday, or (c) a day on which banking or savings institutions in the state of Seller or of Purchaser are authorized or permitted under applicable law to be closed.

"<u>Custodial Account</u>": An account maintained by Seller or its agent for the deposit of principal and interest payments received in respect of one or more Mortgage Loans.

"<u>Custodial File</u>": With respect to an individual Mortgage Loan, the documents required to be held by a Custodian pursuant to the respective Agency Requirements and which are specified on **Exhibit 1-B** attached hereto.

"<u>Custodial File Exceptions List</u>": A list of each document exception for each Mortgage Loan with respect to such documents required to be held by a Custodian pursuant to the respective Agency Requirements.

"<u>Custodian</u>": Bank of New York - Mellon or such other entity mutually agreed upon to act as the Mortgage Loan document custodian pursuant to the respective Agency Requirements.

"<u>Cut-off Date</u>": November 30, 2022, or such other date as mutually agreed upon by the parties and set forth on the Bill of Sale.

"<u>Data File</u>": All information with respect to the Mortgage Loans delivered by Seller in a mutually agreed upon format and attached to the Transfer Instructions.

"<u>Defect</u>": Any breach, untruth or incorrectness in any respect of any representation or warranty herein contained with respect to a Mortgage Loan or any failure by Seller to materially comply with any covenant or term or condition herein contained with respect to a Mortgage Loan which could reasonably be expected to result in a loss or damage to Purchaser or the imposition of additional servicing burdens with respect to such Mortgage Loan.

"<u>Deficiency List</u>": The meaning set forth in Section 2.02(c).

"<u>Due Diligence</u>": A review of loan files, monthly reconciliations, delinquent loan reporting, servicing notes and other related loan information, as may be described herein, and specifically at Section 6.05.

"<u>Effective Date</u>": As defined in the introductory paragraph to this Agreement.

"<u>Electronic Mortgage</u>": A Mortgage Loan for which the promissory note and possibly other documents (such as the security instrument and mortgage loan application) are created and stored electronically rather than by using traditional paper documentation that has a pen and ink signature.

"<u>Escrow Account</u>": An account maintained by Seller or its agent for the deposit of Escrow Payments received in respect of any Mortgage Loans in accordance with Applicable Requirements.

"<u>Escrow Funds</u>": Balances held in the Escrow Account.

3

"Escrow Payments": The amounts required or permitted to be escrowed by the Mortgage Loan documents or the applicable Agency Requirements (including, without limitation, amounts constituting ground rents, taxes, assessments, mortgage insurance premiums and fire and hazard insurance premiums) and which have been escrowed by the Mortgagor with Seller pursuant to any Mortgage Loan.

"Excluded Loans": Mortgage Loans (i) that are thirty (30) or more days delinquent as of each Sale Date, (ii) that are subject to any active bankruptcy or litigation proceeding, (iii) that are subject to any active foreclosure actions, (iv) where Seller has been notified by the Agency as being subject to repurchase, (v) that were not originated pursuant to, or in accordance with, any state, county or other housing finance agency bond program, (vi) that are subject to an FHA, VA or USDA insurance guaranty, (vii) that are subject to any payment forbearance or deferral, (ix) that are secured by a residence or dwelling on the related Mortgaged Property that is a manufactured dwelling or mobile home, (x) that are secured by a Mortgaged Property not located in one of the fifty U.S. states or District of Columbia.

"Excluded Obligations": Any of the following liabilities, claims or other obligations: (i) any obligations of Seller as the originator or Seller of any Mortgage Loan, including, but not limited to, any obligations in connection with any representations, warranties or covenants made by Seller as Seller of any Mortgage Loan or to the Agency or any obligations to remedy breaches of any such Seller representations, warranties or covenants, or to indemnify any party in connection therewith or any other recourse obligation of Seller as Seller of any Mortgage Loan to the Agency pursuant to the respective Agency Guides; (ii) any repurchase, repurchase alternative, indemnification or other obligations arising under the Agency Contract resulting from or relating to (x) representations, warranties and covenants of Seller contained therein, or (y) acts or omissions of Seller, any Originator or a Prior Servicer (whether occurring prior to, on or following the respective Transfer Date), in each case except to the extent resulting from Purchaser's servicing activities on or after the respective Transfer Date; and (iii) any liabilities in tort, contract or otherwise to the extent arising out of or in connection with any acts or omissions of Seller or any Originator in respect of the origination of any Mortgage Loans or the servicing thereof prior to the respective Transfer Date.

"Exhibit": Any exhibit attached hereto or delivered or to be delivered pursuant to this Agreement.

"Fannie Mae": The Federal National Mortgage Association and its successors and assigns.

"Fannie Mae Guides": As applicable the Fannie Mae Single-Family Seller/Servicer Guide.

"Fannie Mae Pool": One or more Mortgage Loans delivered to Fannie Mae in one sale transaction and assigned one pool number by Fannie Mae.

"Fannie Mae Purchase Price Percentage": 1.125% or 112.5 basis points.

"Fannie Mae Sale Date": November 30, 2022, or such other date as mutually agreed upon by the parties and set forth in the related Bill of Sale.

"Fannie Mae Transfer Date": February 1, 2023, or such other date as mutually agreed upon by the parties and set forth in the related Bill of Sale.

"FHA": The Federal Housing Administration of HUD or any successor thereto.

"Freddie Mac": The Federal Home Loan Mortgage Corporation and its successors and assigns.

"Freddie Mac Guides": As applicable the Freddie Mac Single-Family Seller/Servicer Guide.

118565008\V-2

"Freddie Mac Pool": One or more Mortgage Loans delivered to Freddie Mac in one sale transaction and assigned one pool number by Freddie Mac.

Freddie Mac Purchase Price Percentage": 1.125% or 112.5 basis points.

"Freddie Mac Sale Date": November 30, 2022, or such other date as mutually agreed upon by the parties and set forth in the related Bill of Sale.

"Freddie Mac Transfer Date": February 1, 2023, or such other date as mutually agreed upon by the parties and set forth in the related Bill of Sale.

"Governmental Entity": Any federal, state or local government or regulatory or enforcement authority of any such government or any court, governmental or administrative agency or commission or any other authority or instrumentality of any such government.

"Holdback": The meaning set forth in Section 2.02(c).

"HUD": The United States Department of Housing and Urban Development or any successor thereto.

"Insurance Policy": All of Seller's right, title and interest under any of the Private Mortgage Insurance Policies and hazard insurance, title insurance policies and certificates related to a Mortgage Loan.  References in this Agreement to hazard insurance shall be construed to include flood insurance to the extent that flood insurance is required of a Mortgage Loan, in accordance with Applicable Requirements.

"Interim Period":  The period of time between the related Sale Date and the related Transfer Date, during which Seller or its subservicer will continue to service the Mortgage Loans on behalf of Purchaser in accordance with Accepted Servicing Practices and the Interim Servicing Agreement.

"Interim Servicing Agreement":  That certain agreement attached hereto as **Exhibit 6** executed on the Effective Date, between Purchaser and Seller providing for the subservicing of the Mortgage Loans during the Interim Period.

"Losses": Any and all losses, damages, deficiencies, claims, costs or expenses, including without limitation, reasonable attorneys' fees and disbursements, the amounts of denied insurance or guaranty coverage, increased costs of servicing the Mortgage Loans (including in the form of additional fees, charges or other compensation payable to Purchaser's subservicer) and other reasonable out-of-pocket costs or expenses incurred in connection with the defense of any actual or threated action.

"MERS": Mortgage Electronic Registration Systems, Inc.

"MERS MOM": MERS, as Original Mortgagee.

"Monthly Payment": The scheduled monthly payment of principal, interest and Escrow Payments, if applicable, on a Mortgage Loan.

"Mortgage": A mortgage, deed of trust, security deed or other instrument creating a first lien on real property securing the Mortgage Note relating thereto.

5

118565008\V-2

"Mortgage File": The hardcopy documents or, to the extent permitted by the Agency Requirements, imaged documents pertaining to a particular Mortgage Loan, which are specified on **Exhibit 1-A** hereto, including those documents required to be in the Custodial File.

"Mortgage Loan": An individual mortgage loan that is identified on the related Mortgage Loan Schedule.  For the avoidance of doubt, a Mortgage Loan that becomes an REO Property after a Sale Date shall nevertheless be considered a Mortgage Loan for purposes of interpreting the language herein.

"Mortgage Loan Documents": The documents contained in the Mortgage File.

"Mortgage Loan Schedule": The list of Mortgage Loans attached as Schedule A to each Bill of Sale, which Schedule A shall set forth, as of the date specified in such Schedule A, without limitation, the information for each Mortgage Loan listed on Exhibit 2 hereto.

"Mortgage Note": The promissory note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

"Mortgaged Property": The underlying real property encumbered by a Mortgage securing repayment of a Mortgage Note.

"Mortgagor": The Person(s) obligated on or under a Mortgage Note.

"Order": Any preliminary or permanent order, injunction, judgment, decision, verdict, mandate, directive, decree, ruling, writ, assessment, or other similar determination or finding by or before a Governmental Entity or arbitrator.

"Originator": With respect to each Mortgage Loan, any person (other than Seller) acting as or on behalf of the mortgagee or lender in connection with the marketing, underwriting, origination or ownership of such Mortgage Loan (prior to the respective Transfer Date), including without limitation any loan broker, any Prior Servicer, any correspondent lender, any subservicer or any servicer subcontractor.

"Person": Any individual, corporation, company, voluntary association, partnership, joint venture, limited liability company, trust, unincorporated association or government entity (or any agency, instrumentality or political subdivision thereof).

"Prior Servicer": Any Person that was the servicer or subservicer of any Mortgage Loan before Purchaser became the servicer of the Mortgage Loan, which may be the Originator, and which includes any subservicer.

"Private Mortgage Insurance Policy" or "PMI Policy": Each private mortgage insurance policy required to be in effect for a specific Mortgage Loan pursuant to the applicable Agency Requirements, or any replacement policy therefor obtained by Seller.

"Privacy Act": Each of (a) Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. 6801 et seq. (collectively, the "Gramm-Leach-Bliley Act"); (b) the applicable federal regulations implementing the Gramm-Leach-Bliley Act and codified at 12 CFR Parts 40, 216, 332, and/or 573; (c) FFIEC Interagency Guidelines Establishing Standards For Safeguarding Customer Information and codified at 12 CFR Parts 30, 208, 211, 225, 263, 308, 364, 568, and/or 570; and (d) all other applicable state and local laws, rules, regulations and orders relating to the privacy and security of Mortgagor information.

6

118565008\V-2

"Pool": As applicable to the context in which such term is used relating to the sale or servicing of the related Mortgage Loans, either individually, a Fannie Mae Pool or a Freddie Mac Pool, or collectively, Fannie Mae Pools and Freddie Mac Pools.

"Purchase Price": The amount to be paid by Purchaser to Seller as consideration for the Servicing Rights pursuant to Section 2.02 of this Agreement, which shall be comprised of the Servicing Rights Purchase Price and the Advances Purchase Price.

"Purchase Price Percentage": As applicable to the context in which such term is used relating to the sale of the Servicing Rights, either or both the Fannie Mae Purchase Price Percentage or the Freddie Mac Purchase Price Percentage.  The aggregate Purchase Price Percentage for both Pools is 1.125%.

"Purchaser": Seneca Mortgage Servicing LLC, a Delaware limited liability company and its successors and assigns.

"Records": Work files, individual accounts, books, documents, files, correspondence, related information or data of any kind relating to the Servicing Rights and the records created by Purchaser or Seller in connection with the Servicing Rights.

"Recourse Mortgage Loans": Mortgage Loans sold to an Agency on a so-called "life of loan" recourse or limited recourse basis, it being acknowledged that such Agency assumes no losses on any Recourse Mortgage Loans, including losses incurred in connection with a default under, or the foreclosure of, acceptance of deed in lieu of foreclosure or related action.

"Relationship Officer":  An officer level employee of Seller as specified by Seller from time to time to manage and oversee the transfer of the Servicing Rights from Seller to Purchaser pursuant to the Transfer Instructions and other terms of this Agreement.

"REO Property": Any Mortgaged Property acquired through foreclosure, deed in lieu of foreclosure, or other realization procedure.

"Sale Date": As applicable to the context in which such term is used relating to the sale of the Servicing Rights, either or both, the Fannie Mae Sale Date or the Freddie Mac Sale Date.

"Schedule": Any schedule attached hereto or delivered or to be delivered pursuant to this Agreement.

"Seller": Homespire Mortgage, a Maryland corporation.

"Servicing Rights": Collectively, all of Seller's right, title and interest in and to the servicing of the Mortgage Loans, together with all Custodial Accounts, Escrow Accounts, the applicable Mortgage Files, contract rights, incidental income and benefits, and exclusive rights to possession and use of servicing files and records related thereto, including, without limitation, Mortgagor lists, solicitation rights, Insurance Policies and tax service agreements, but specifically excluding Seller's master mortgage impairment policy and any other agreements, instruments, rights, documents or records relating to the continuing business of Seller as a whole, provided, however, that Servicing Rights shall not include any Excluded Obligation (which shall be retained by Seller).

7

"Servicing Rights Purchase Price" has the meaning set forth in Section 2.02.

"Servicing Rights Repurchase Price": The price to be paid by Seller to Purchaser in connection with the repurchase of any Servicing Rights pursuant to either Section 2.02(b) or Article VI of this Agreement which, with respect to any Mortgage Loan, shall be equal to: (i) the product of (a) the applicable Purchase Price Percentage, multiplied by (b) the unpaid principal balance of the related Mortgage Loan on the date of repurchase; plus, (ii) any unreimbursed amounts that were required to be advanced by Purchaser to an Agency pursuant to Agency Requirements; plus (iii) the reimbursement of all other unreimbursed actual and reasonable out-of-pocket costs and expenses incurred by Purchaser in connection with such Servicing Rights and such Mortgage Loan, which include, without limitation, all costs and expenses incurred by Purchaser in effectuating the repurchase of such Servicing Rights, including, if applicable, transferring the servicing and forwarding documents for the transfer of such Servicing Rights and such Mortgage Loan, but which excludes such losses, costs and expenses to the extent that they are a result of Purchaser's failure to service such Mortgage Loan in compliance with Accepted Servicing Practices, provided that such failure was not as a result of Seller's breach of this Agreement.

"Servicing Type": The applicable Agency investor accounting remittance options.

"Transfer Date": As applicable to the context in which such term is used relating to the sale of the Servicing Rights, either or both the Fannie Mae Transfer Date or the Freddie Mac Transfer Date.

"Transfer Instructions":  The transfer instructions attached hereto as **Exhibit 7**, which govern the transfer of servicing and related information, documentation, and files to Purchaser.

 "Transfer Notice":  The notification letter required by law to be delivered to each Mortgagor at least fifteen (15) days prior to the respective Transfer Date in compliance with Applicable Requirements, including without limitations the Real Estate Settlement Procedures Act codified at 12 USC § 2601 et seq. and implemented by Regulation X, 12 C.F.R. Part 1024.33.

"UCC": The Uniform Commercial Code, as in effect in the applicable jurisdiction.

"USDA": The United States Department of Agriculture, including its Rural Development and Rural Housing Service agencies, and any successors thereto.

"VA": The United States Department of Veterans Affairs and any successor thereto.

ARTICLE II
SALE AND CONVEYANCE OF SERVICING RIGHTS

Section 2.01    Agreement to Sell the Servicing Rights.

On each Sale Date, as hereinafter provided and subject to the terms and provisions of this Agreement, Seller shall sell, transfer and assign, set over and convey to Purchaser, and Purchaser shall purchase and assume from Seller, all rights, title, and interest of Seller in, to, and under the related Servicing Rights (including but not limited to the Mortgage Files) for the related Mortgage Loans; provided, however, that Purchaser shall not assume any Excluded Obligations and Seller shall retain all Excluded Obligations.

The Servicing Rights are, with respect to the related Mortgage Loans, wholly owned by Seller prior to the sale of such Servicing Rights to Purchaser.

8

118565008\V-2

As further set forth in the Interim Servicing Agreement, Purchaser shall be entitled to receive all of the servicing income payable under the Agency Contracts following the Cut-off Date, including but not limited to all accrued and outstanding servicing income as of the Cut-off Date.

Section 2.02    Purchase Price.

In consideration for the transfer and sale of the Servicing Rights as of the applicable Sale Date, Purchaser shall pay to Seller in the manner provided in this Section 2.02, an amount equal to (A) the sum of (i) the product of (a) the Fannie Mae Purchase Price Percentage multiplied by (b) the actual unpaid principal balance of the Fannie Mae Mortgage Loans as of the related Cut-off Date and (ii) the product of (a) the Freddie Mac Purchase Price Percentage multiplied by (b) the unpaid principal balance of the Freddie Mac Mortgage Loans as of the related Cut-off Date (the "Servicing Rights Purchase Price") and (B) one hundred percent (100%) of all documented Advances related to such Servicing Rights that are eligible for reimbursement by the applicable Agency pursuant to Applicable Requirements as determined by Purchaser (the "Advances Purchase Price"; together with the Servicing Rights Purchase Price, the "Purchase Price"). The Advances included for the purposes of the calculation of the Advances Purchase Price shall not include Advances that may be recoverable from the related Mortgagor, unless such Advances are also eligible for reimbursement by the applicable Agency pursuant to Applicable Requirements (as of the related Transfer Date) if not recovered from the related Mortgagor. Purchaser shall pay the Purchase Price as follows:

(a)    Sale Date. On the related Sale Date, Purchaser shall pay to Seller by wire transfer of immediately available funds, ninety percent (90%) of the estimated Purchase Price based upon the unpaid principal balance of the Mortgage Loans as of the most recent available data, however, no earlier than the last day of the month immediately prior to the month in which the Sale Date occurs (the "Preliminary Data"). Seller shall provide to Purchaser the Preliminary Data to calculate the estimated Purchase Price no later than five (5) Business Days prior to a Sale Date.

(b)    Transfer Date. Within ten (10) Business Days after the applicable Transfer Date, Purchaser shall pay to the Seller five percent (5%) of the Purchase Price calculated on the basis of the final Data File and as set forth in Section 2.02(e) below, in immediately available funds, to an account specified by Seller no later than two (2) Business Days prior to the such date, provided, that, Seller has (A) delivered the final Data File; (B) delivered substantially all of the related Mortgage Files in electronic format pursuant to Section 4.02(l); (C) transferred all related funds in the Escrow Accounts and Custodial Accounts pursuant to Section 5.05; (D) notified the related custodians that such Servicing Rights have been sold to the Purchaser and the related custodian shall have identified the Purchaser as "owner" and "servicer" thereof; (E) delivered substantially all of the hard copy Custodial Files and the related updated Custodial File Exceptions List in accordance with Section 4.02(l); (F) delivered copies of the applicable executed Assignments of Mortgage (if non-MERS) that have been sent for recordation and are required as a result of this transaction; (G) delivered copies of the applicable executed Assignments of Mortgage that have been sent for recordation and are required as a result of this transaction; and (H) delivered, if applicable, workout files, bankruptcy and other foreclosure documentation, and collection notes. In the event that a determination has been made as to material noncompliance with the above requirements, payment will be made once the material noncompliance has been cured or resolved. In the event that a reasonable good faith determination has been made as to material noncompliance with the above requirements, payment will be made once the material noncompliance has been cured or resolved.

(c)    Holdback. Purchaser shall defer the payment of a portion of the Servicing Rights Purchase Price transferred on each Transfer Date in an amount equal to five percent (5%) of the related Purchase Price (the "Holdback"). Within sixty (60) days following the related Transfer Date, Purchaser shall

118565008\V-2

deliver or cause to be delivered to Seller a list (the "Deficiency List") with respect to the related Mortgage Loans. identifying any missing, incomplete or defective Mortgage Loan Documents and/or missing Mortgage Files (i) required in order to service the Mortgage Loans in accordance with Applicable Requirements, (ii) required to be maintained or to be made available to any Agency, insurer or Governmental Entity, board, commission, instrumentality or other governmental or quasi-governmental body or office, pursuant to Applicable Requirements, (iii) the absence of which would materially impact the ability to service a Mortgage Loan without additional costs or expense, or (iv) the absence of which would materially and adversely affect the value of any Mortgage Loan or related Servicing Rights, or Purchaser's or the applicable Agency's interests therein ("Missing Documents") *provided, however*, that if Seller fails to transfer substantially all of the applicable Mortgage Loan Documents related to such Mortgage Loans by the deadline provided in this Agreement, then Purchaser shall not be obligated to deliver the related Deficiency List to Seller until one hundred and twenty (120) days following the transfer of substantially all of such Mortgage Files and Mortgage Loan Documents.  Purchaser shall update each Deficiency List each month thereafter to remove from the Deficiency List those Mortgage Loans that no longer have any Missing Documents; *provided, however*, that Purchaser's failure to deliver a Deficiency List or omission of one or more items from a Deficiency List, or Purchaser's release of some or all of the Holdback shall not affect Seller's obligation hereunder to provide the documents and records required by this Agreement.  Subject to the terms of this Agreement, Purchaser shall pay the Holdback on a loan level, pro rata basis (pro rata basis shall mean the number of Mortgage Loans that are no longer identified on a Deficiency List as having any Missing Documents, or that have paid off or otherwise liquidated during the applicable month, divided by the total number of Mortgage Loans on the initial version of such Deficiency List, multiplied by the Holdback on the fifteenth (15th) Business Day of each month following a Transfer Date (beginning in the month subsequent to the month in which the first update to such Deficiency List is required to be provided) for each Mortgage Loan with respect to which all Missing Documents have been provided or corrected (including certified copies of the Assignments of Mortgage sent for recordation), and each Mortgage Loan that has paid off or otherwise been liquidated; *provided, however*, that Purchaser shall retain from the Holdback transferred on each Transfer Date a minimum of the greater of (1) twenty percent (20%) of the Holdback and (2) One Hundred Dollars ($100) multiplied by the number of Mortgage Loans on the most recently updated Deficiency List, until all Missing Documents are provided or corrected (including the recorded Assignments of Mortgage required as a result of this transaction) for all related Mortgage Loans. Following notice to Seller, Purchaser may use the remaining Holdback to cure the outstanding Missing Documents on reasonable terms at competitive market rates.  After the expiration of a twelve (12) month period after the applicable Transfer Date, Purchaser may either: (i) continue to retain any Holdback until the outstanding Missing Documents are cured, (ii) use the remaining Holdback to cure the outstanding Missing Documents on reasonable terms at competitive market rates, or (iii) engage a third-party, at Seller's sole cost and expense, to cure any remaining Missing Documents on an expedited timeframe, in which case, Purchaser shall remit the remaining Holdback to Seller at such time as the third party cures all remaining deficiencies.  In the event that (A) the remaining Holdback is greater than the cost to cure, Purchaser shall release the positive difference to Seller, or (B) the remaining Holdback is less than the cost to cure, Seller shall wire the positive difference between such amounts in immediately available funds to Purchaser to the account designated by Purchaser no later than three (3) Business Days following such request for payment.  For the avoidance of doubt, no consideration shall be given to the limitations of liability set forth in Article VI for purposes of this Section 2.02(c).

(d)    Payment of Advances Purchase Price.  Purchaser shall pay Seller the Advances Purchase Price, by wire transfer of immediately available funds, by the later of (i) fifteen (15) days after the applicable Transfer Date and (ii) three (3) Business Days after Purchaser's receipt of both (x) reasonable, customary and required documentation and support sufficient to reasonably enable Purchaser or

10

Purchaser's designee to make an assessment of the eligibility of the Advances for reimbursement by the applicable Agency pursuant to Applicable Requirements and (y) the related Mortgage File.

(e)    True-up of Purchase Price.  On or about ten (10) Business Days following the final Sale Date, or such other date mutually agreed upon by Seller and Purchaser, Purchaser may revise the Purchase Price in the event that the characteristics of the Mortgage Loans materially differ from the characteristics of the Mortgage Loans set forth in the related letter of intent.  Seller must provide written notification to Purchaser within five (5) Business Days of receipt of the revised Purchase Price whether Seller accepts or rejects the revised Purchase Price.  If Seller rejects the revised Purchase Price, Seller shall no later than one (1) Business Day following notification to Purchaser of such rejection remit to Purchaser the amount of the Purchase Price paid to Seller by Purchaser on each Sale Date and Purchaser shall have no further obligation to remit any remaining unpaid portion of the Purchase Price.  If Seller accepts the revised Purchase Price, no later than ten (10) Business Days following such acceptance Seller shall pay to Purchaser that portion of the Purchase Price based on such adjustment.

(f)    Ineligible Mortgage Loans.  In the event the Mortgage Loans with respect to the Servicing Rights sold to Purchaser during any given month deviate from the loan characteristics as set out on **Exhibit 3**, Seller agrees the Purchase Price shall be reduced by the cumulative amount of the variance percentages.  A revision in the Purchase Price under this scenario will not constitute a change in price with regards to a Material Market Change.

(g)    Prepayment.  With respect to a Mortgage Loan that has prepaid in full or reduced by more than fifty percent (50%) of the unpaid principal balance within the ninety (90) day period following the applicable Sale Date, Purchaser shall be reimbursed an amount equal to the Servicing Rights Purchase Price and if the Mortgage Loan has prepaid in full, the Advances Purchase Price, to the extent that Advances which are outstanding to Purchaser have not been recovered.  Purchaser shall provide a written invoice to Seller for any such amount which shall be paid promptly from the date of Seller's receipt of Purchaser's written request, but in no event later than ten (10) Business Days following Seller's receipt of such request (or Purchaser may, following notice to Seller of such amounts, offset such amounts against any payments of Purchase Price for any Servicing Rights).

(h)    Payment Default.  With respect to each Sale Date, on the date that is ninety (90) days after such Sale Date (if such day is not a Business Day, the next Business Day) for any Mortgage Loan if such Mortgage Loan becomes (i) sixty (60) or more days delinquent, or (ii) becomes subject to (x) a forbearance plan, (y) Bankruptcy Event or (z) foreclosure proceeding, the Seller shall, upon Purchaser's demand, repurchase the Servicing Rights at the Servicing Rights Repurchase Price.

(i)    Flood and Tax Contracts.  As of the applicable Agency Settlement Date, Seller will either (i) assign to Purchaser Corelogic life-of-loan, fully transferable (at no cost to Purchaser), flood and tax certification contracts, or (ii) pay Purchaser an amount equal to (a) the actual certification fee charged by Corelogic for all Mortgage Loans that have transferable flood and tax certifications if such flood and tax certifications are not with CoreLogic, or (b) the actual costs of a replacement contract with Corelogic for all Mortgage Loans that do not have a transferable CoreLogic flood or tax certification contract.  Seller will be responsible and pay for one hundred percent (100%) of the transfer fees related to the transfer of said contracts.  Seller shall ensure that the life-of-loan tax contracts and the flood certificates are purchased and/or transferred to Purchaser by the subservicer on the Transfer Date.

(j)    Excluded Loans.  Purchaser shall not have any obligation to purchase any Servicing Rights relating to any Mortgage Loan that is an Excluded Loan.  If Purchaser purchases any

11

Excluded Loans, the outstanding principal balances of the Excluded Loans shall be excluded from the aggregate outstanding principal balances of the Mortgage Loans for the purposes of the calculation of the Purchase Price.

(k)    Set-Off.  Seller hereby grants Purchaser a right of setoff against the Holdback provided for under Section 2.02(c) in the event that (i) the Holdback is insufficient to cover any costs and expenses relating to curing Missing Documents, (ii) Seller owes any other amounts to Purchaser pursuant to this Section 2.02, and (iii) Purchaser incurs any Losses for which Purchaser is entitled to indemnification by Seller pursuant to Section 6.02.  Seller further agrees that should Purchaser reimburse itself in such manner, such reimbursement shall not act as a waiver or other limitation of any other right or remedy Purchaser may have under the law, at equity, or pursuant to this Agreement.  Purchaser shall provide a written invoice to Seller for any such amount which shall be paid within ten (10) Business Days from the date of Seller's receipt of Purchaser's written request.

Section 2.03    Closing Conditions.

(a)    Purchaser's obligation to consummate its purchase of any Servicing Rights pursuant to this Agreement on the related Sale Date is subject to the satisfaction or waiver by Purchaser on or prior to such Sale Date of the following conditions:

i.    Seller shall have performed in all material respects all of its covenants and agreements contained herein which are required to be performed by Seller on such Sale Date or Transfer Date, as applicable, and all material terms and conditions of this Agreement required to be complied with by Seller shall have been duly complied with at or prior to such Sale Date or Transfer Date, as applicable;

ii.    All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of such Sale Date or the related Transfer Date, as applicable;

iii.    Purchaser shall have received from Seller, on or before the initial Sale Date, and as otherwise reasonably requested by Purchaser, an Officer's Certificate of Seller, in a form acceptable to Purchaser, including all attachments thereto, stating, among other things, that each of Seller's representations and warranties made herein is true and correct and that all of the terms, covenants and conditions of this Agreement required to be complied with and performed by Seller at or prior to the applicable Sale Date and/or Transfer Date, as applicable, have been duly complied with and performed, and solely with respect to the initial Sale Date, a Certificate of its Secretary or Assistant Secretary, reciting the approval of the Board of Directors of Seller of the transfer and sale of the Servicing Rights to Purchaser and authorizing the officers of Seller to execute such documents as may be necessary to accomplish the transactions contemplated hereby;

iv.    Seller shall have provided to Purchaser information reasonably satisfactory to Purchaser to evidence that the financial condition of Seller is adequate to support the performance by Seller on a timely basis of Seller's potential indemnification and other obligations hereunder;

v.    There shall have been no material adverse change in the condition (financial or otherwise), business, net worth, assets (including without limitation the Servicing Rights, the Escrow Accounts or the Mortgage Loans), properties or operations or future prospects

12

of Seller, and there shall not have been any occurrence circumstance or combination thereof, whether arising heretofore or thereafter, including pending or threatened litigation, which might reasonably result in any such material adverse change before or after each Sale Date;

vi.      In the event Seller (or any Affiliate of Seller) has financed any of the Servicing Rights or Mortgage Loans, Seller shall obtain from the secured party and deliver to Purchaser a written agreement, in form and substance acceptable to Purchaser, to the effect that such secured party releases any right, title and interest it may have in the Servicing Rights and/or the Mortgage Loans; and

vii.     Seller and Purchaser shall have received such documents as specified in Section 4.01.

(b)      If the closing conditions stated above are not satisfied in all material respects or waived by Purchaser with respect to the Servicing Rights or subset thereof prior to a scheduled Sale Date or Transfer Date, as applicable, or such later date(s) as may be agreed to by Purchaser and Seller, Purchaser shall have the option of rejecting the purchase of the Servicing Rights, which option may be exercised by written notice to Seller, and shall have no further obligation with respect to such Servicing Rights under this Agreement upon the exercise of such option.

(c)      Seller shall, at the option of Purchaser, repurchase from Purchaser any Servicing Rights that are sold to Purchaser but not transferred to Purchaser for any reason within thirty (30) days following the related Transfer Date, an amount equal to the Servicing Rights Repurchase Price.  In each case, Seller shall wire to Purchaser the said amount within seven (7) Business Days from the date of Seller's receipt of Purchaser's written request therefor.

## ARTICLE III
### REPRESENTATIONS, WARRANTIES, AND COVENANTS

Section 3.01     <u>Representations and Warranties and Covenants with respect to the Servicing Rights</u>.

Seller represents, warrants and covenants to Purchaser as to the Servicing Rights to be conveyed by Seller to Purchaser pursuant to this Agreement, as of each Sale Date and each Transfer Date contemplated by this Agreement, as follows:

(a)      The information set forth on the Mortgage Loan Schedule and the related Data File, and on any updates thereof or other document, instrument or schedule furnished to Purchaser by Seller or one of its affiliates pursuant to, or prior to and in connection with, this Agreement and the related Sale Date and Transfer Date is accurate and complete in all material respects, and relates exclusively to the subject Mortgage Loans, as of the dates indicated thereon or otherwise applicable.

(b)      Seller has taken all necessary steps to make and keep any Private Mortgage Insurance Policy valid, binding and enforceable.  As to each PMI Policy with respect to each applicable Mortgage Loan, Seller and any Prior Servicer have complied with applicable provisions of the PMI Policy and Applicable Requirements, all premiums or other charges due in connection with such PMI Policy have been paid, there has been no act or omission which would or may invalidate any such PMI Policy, and the insurance is in full force and effect with respect to the related Mortgage Loan.  There are no defenses, counterclaims, or rights of set-off affecting the validity or enforceability of any PMI Policy with respect to a Mortgage Loan.  No PMI Policy is subject to an actual, pending or threatened cancellation, rescission or

13

denial.  Seller has no separate agreements with any PMI Policy provider, with respect to indemnification or submission of claims for any of the Mortgage Loans.

(c)　　If an Escrow Account is required to be maintained with respect to any Mortgage Loan, (i) all interest required pursuant to Applicable Requirements to be paid on funds in such Escrow Account through the respective Transfer Date has been or will be credited to the account of the related Mortgagor, and reasonable evidence of such credit shall be provided to Purchaser; and (ii) such interest has been and through the respective Transfer Date will be properly computed and paid in accordance with Applicable Requirements.

(d)　　All Custodial Accounts and Escrow Accounts are maintained by Seller and have been maintained in accordance with Applicable Requirements.  The Escrow Payments required, which have been paid to Seller or its subservicer for the account of the Mortgagors, are on deposit in the appropriate Escrow Account in accordance with Applicable Requirements.  The required amount of the Escrow Payment for each Mortgage Loan was analyzed when required by the Applicable Requirements, and the amount was established to avoid a deficiency or, adjusted to eliminate any deficiency discovered, as applicable.  Additionally, Seller, Prior Servicer and each Originator has (i) computed the amount of the Mortgage Loan payments in accordance with Applicable Requirements, (ii) paid on a timely basis all charges and other items to be paid out of the Escrow Payments, and when required by the Applicable Requirements has advanced its own funds to pay such charges and items, and (iii) delivered to the related Mortgagors the statements and notices required by the Applicable Requirements in connection with the related Escrow Accounts, including without limitation statements upon the creation of the related Escrow Accounts and required statements of taxes and other items paid out of the Escrow Payments and notices of adjustments to the amount of the Escrow Payments.

(e)　　The Advances are valid and existing accounts owing to Seller and are carried on the books of Seller at values determined in accordance with generally accepted accounting principles, are fully collectable, are not subject to any set-offs or claims and are eligible for reimbursement by the applicable Agency.  All Advances are sufficiently supported through documentation and explanation satisfactory to Purchaser, and in accordance with Accepted Servicing Practices, specifically including the Agency Requirements.

(f)　　All necessary documentation with respect to the servicing of the Mortgage Loans has been properly and accurately completed and executed, and all documents required hereby or by the Agency Guides or the Agency Contract, as applicable, to be in the Custodial File and Mortgage File are contained therein and final certifications thereto by the Custodian have been completed, including, but not limited to, any required pool certifications.

(g)　　All funds received by Seller in connection with the Mortgage Loans, including, without limitation, fire insurance proceeds from fire losses, condemnation proceeds and principal reductions, have been promptly deposited in the Custodial Account or the Escrow Account, as applicable, and all such funds have been applied to reduce the principal balance of the Mortgage Loans in question, or for reimbursement of repairs to the Mortgaged Property in accordance with Applicable Requirements.

(h)　　No payment of principal or interest on any Mortgage Loan is subject to any forbearance or has otherwise been forgiven, deferred, suspended or rescheduled except as disclosed on the related Mortgage Loan Schedule and related Data File, and no waiver, alteration or modification which would adversely affect the value of the Servicing Rights has been made to the terms or provisions of such

14

Mortgage Loans except as disclosed on the related Mortgage Loan Schedule and related Data File and permitted under Applicable Requirements.

(i)     Each Mortgage Loan conforms to and complies with Applicable Requirements. Each Mortgage Loan has been originated, underwritten, sold, pooled and serviced in compliance with all applicable local, state or federal laws, regulations, and the related Agency Guide, including, without limitation, those pertaining to usury, and at origination all Mortgage Loan documents were in compliance with applicable law and Agency Requirements.  There has been no act or omission or alleged act or omission, or error by Seller, Originator or Prior Servicer or any employee, agent or representative acting on their behalf, with respect to the origination, underwriting, servicing, sale or pooling of any of the Mortgage Loans which are not in conformity with the Applicable Requirements.  Seller has disclosed in writing any non-standard provisions related to the origination, underwriting, closing, sale, delivery, pooling, securitization or servicing of such Mortgage Loans, which shall be subject to the confidentiality provisions of this Agreement.

(j)     Each of the selling and servicing representations and warranties made by Seller to the applicable Agency under the applicable Agency Contract at the time of delivery of the related Mortgage Loan to such Agency was true and correct at the time of such delivery and are true and correct as of the related Sale Date.

(k)     As of the related Sale Date, there are no contracts affecting the Servicing Rights to which Purchaser is or will be bound by or to, except as contemplated hereby or caused to exist by Purchaser nor shall Seller enter into any such contracts following the related Sale Date without the consent of Purchaser other than as permitted or contemplated by the related Agency Guides, and no other party has any interest in the Mortgage Loans or the Servicing Rights except the related Agency, or otherwise as contemplated hereby.

(l)     None of the Mortgage Loans are loans subject to interest rate subsidies or special escrow arrangements.

(m)     There is no agreement, arrangement or understanding between Seller and any Mortgagor to refinance a Mortgage Loan.

(n)     All Mortgage Loans shall be subject to fully transferable at no cost to Purchaser, life-of-loan flood and tax certification contracts with CoreLogic.

(o)     All improvements upon each Mortgage Property are covered by a valid, binding and existing hazard insurance policy that is in full force and effect providing fire extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located and in an amount that is at least equal to the outstanding principal balance of the Mortgage Loan, subject to the Applicable Requirements that limit the amount of such insurance that may be required, and with a carrier, acceptable to the applicable Agencies.  If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a valid, separate and binding flood insurance policy or endorsement in a form meeting the requirements of Applicable Requirements exists and is in full force and effect issued by an insurer acceptable to the applicable Agencies in an amount that is at least equal to (i) the outstanding principal balance of the Mortgage Loan, or (ii) the maximum amount of insurance that is available under the Flood Disaster Protection Act of 1973, whichever is less; provided, however, that flood insurance will not be required if the Mortgaged Property is an individual unit in a condominium if the applicable Agency does not require such insurance with respect to the unit.  The

15

Mortgage for each Mortgage Loan obligates the related Mortgagor to maintain all insurance required described above and to pay all premiums and charges in connection therewith, and on the Mortgagor's failure to do so, authorizes the mortgagee to maintain such insurance at Mortgagor's cost and expense and to seek reimbursement therefore from the Mortgagor.  All such insurance policies are in full force and effect, and all premiums with respect to such policies have been paid.

(p)     If the Mortgaged Property is an individual unit in a condominium project or an individual unit in a planned unit development, then the common elements and property of the condominium project or the common areas and property of the planned unit development are insured against loss by fire, hazards of extended coverage, flood and such other hazards as required by the applicable Agency.  Without limiting the foregoing, each required insurance policy is in a form and amount, and is issued by an insurer, that is acceptable to the applicable Agency with respect to the condominium project or planned unit development.  Additionally, if the Mortgaged Property is an individual unit in a condominium project or an individual unit in a planned unit development, then general liability, fidelity and all other insurance required by the applicable Agency is maintained in connection with the condominium project or planned unit development, and each required insurance policy is in a form and amount, and is issued by an insurer, that is acceptable to the applicable Agency with respect to the condominium project or planned unit development.  All such insurance policies are in full force and effect, and all premiums with respect to such policies have been paid.  Each insurance policy required includes the following special endorsements, to the extent required by the Applicable Requirements:

(i)     Advance written notice will be given in writing to the mortgagee, its successors and/or assigns in the event the policy is to be canceled, no earlier than the time specified in the Applicable Requirements.

(ii)    The mortgagee, its successors and/or assigns, or such other appropriate Persons specified by the Applicable Requirements, must be named in the mortgagee clause or loss payment clause, requiring any loss be paid to the mortgagee, its successors and/or assigns, or such other appropriate Persons.  This clause must be written into the policy and provide that in the event of loss, the interest of the mortgagee as successor in interest is not impaired by an act or neglect of the Mortgagor, any foreclosure, notice of sale or any change in ownership of the Mortgaged Property.  Seller has provided the appropriate insurer with such notice, or has obtained such consent, as is necessary to designate the appropriate Persons required by the Applicable Requirements as loss payee on each such insurance policy.

(q)     None of the Mortgage Loans are Recourse Mortgage Loans.

(r)     None of the Mortgage Loans are graduated payment Mortgage Loans or growing equity Mortgage Loans, nor is any Mortgage Loan subject to a buydown or similar arrangement.

(s)     No Mortgage Loan is a "high cost" or "Section 32" loan subject to the provisions of the Homeownership and Equity Protection Act of 1994 or is considered a "high cost mortgage" loan under any other federal, state or local anti-predatory lending law applicable at the time the loan was originated.  No predatory lending practices were employed in connection with the origination of any of the Mortgage Loans that at the time of origination were subject to an applicable state or local law governing predatory lending practices, as such practices are defined therein.  Each Originator was qualified to do business, and had all requisite licenses, permits and approvals, in the states in which the applicable Mortgaged Properties are located, except where the failure to possess such qualifications, licenses, permits and approvals would not materially and adversely affect the enforceability of the Mortgage Loan Documents by Purchaser.

16

118565008\V-2

(t)    Seller has complied with all requirements of the Privacy Act with respect to each Mortgage Loan as required by Applicable Requirements.

(u)    All Mortgage Loans are properly registered in MERS.

(v)    No Mortgage Loan is subject to any active or ongoing litigation proceedings.  No Mortgagor or Mortgage Loan is subject to a proceeding pursuant to which the Mortgagor has sought relief under or has otherwise been subjected to federal or state bankruptcy or insolvency laws (including Chapter 7 of the U.S. Bankruptcy Code) or any other similar federal or state laws of general application for the relief of debtors.  No action has been taken with respect to any Mortgage Loan to commence any proceedings by which a lienholder acquires title to a Mortgaged Property in a foreclosure sale, or a sale under power of sale, or other acquisition of title to the Mortgaged Property based upon a default by the Mortgagor under the Mortgage Loan Documents.

(w)    No Mortgage Loan is a Higher Priced Mortgage Loan as defined in either (i) Section B2-1.4-02 of the Fannie Mae Single Family Selling Guide (as updated from time to time by Fannie Mae) or (ii) in the Glossary of the Freddie Mac Single Family Seller/Servicer Guide (as updated from time to time by Freddie Mac), as applicable.

(x)    No Mortgage Loan is an eMortgage loan as defined in either (i) Section 2.1 of the Guide to Delivering eMortgage Loans to Fannie Mae (as updated from time to time by Fannie Mae), (ii) in the Glossary of the Freddie Mac eMortgage Guide (as updated from time to time by Freddie Mac) or (iii) any other Agency Guide, as applicable.  No Mortgage Loan shall have an Electronic Mortgage.

(y)    As of the applicable Sale Date, no Mortgage Loan is insured by the FHA or guaranteed by VA or USDA.

(z)    All Mortgage Loan interest rate information is net of any and all mortgage insurance premiums unless otherwise indicated.

(aa)    There are no accrued or contingent liabilities of Seller with respect to the Mortgage Loans or Servicing Rights for which Purchaser would be responsible, or circumstances under which such accrued or contingent liabilities will arise against Purchaser, with respect to occurrences prior to the applicable Sale Date, other than those liabilities that arise in the ordinary course of business and without a breach of the Applicable Requirements.

(bb)    Seller has filed, or will file, all IRS Forms, including but not limited to Forms 1041 K1, 1041, 1099 INT, 1099 MISC, 1099A and 1098, as appropriate, which are required to be filed with respect to the Servicing Rights for activity that occurs on or before the applicable Sale Date.

(cc)    No improvements located on or being part of the Mortgaged Property are in violation of any applicable zoning law or regulation and all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities and the Mortgaged Property is lawfully occupied under applicable law.  Seller has received no notices of any violation of any law, municipal or other governmental ordinances, orders, rules, regulations or requirements that have not been cured, or any restrictive covenants against or affecting the Mortgaged Property, or any part thereof, nor is Seller aware of any facts which might result in such a violation.

17

118565008\V-2

(dd)    To the best of Seller's knowledge, there exists no physical damage to any Mortgaged Property from fire, flood, windstorm, earthquake, tornado, hurricane or any other similar casualty, which physical damage would materially and adversely affect the value or marketability of any Mortgage Loan, the Servicing Rights, the Mortgaged Property or the eligibility of the Mortgage Loan for insurance benefits by any insurer.  To the best of Seller's knowledge, there is no proceeding pending for the total or partial condemnation of, or eminent domain with respect to, the Mortgaged Property.  All of the improvements that were included for the purpose of determining the appraised value of the Mortgaged Property for a Mortgage Loan lie wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property.  The Mortgaged Property is not and has not been in violation of any standards under, applicable statutes, ordinances, rules, regulations, orders or decisions with regard to pollutants or hazardous or toxic substances, including without limitation the Comprehensive Environmental Response, Compensation and Liability Act, Federal Water Foliation Control Act, Clean Air Act, and Toxic Substances Control Act, as such laws are amended and supplemented from time to time and any analogous federal, state or local statutes, rules and regulations.

(ee)    Each related Mortgage Loan shall (i) be secured by a Mortgage for which the related Mortgaged Property is a one to four family residential real property, (ii) be secured by a Mortgage that is in a first lien position and (iii) be delivered to an Agency prior to the Sale Date.  Each Mortgage has been duly acknowledged and recorded, or has been submitted for recordation in the jurisdiction in which the related Mortgaged Property is located, and is a valid and subsisting first lien, and the Mortgaged Property is free and clear of all encumbrances and liens having priority over the lien of the Mortgage, other than (x) liens for real estate taxes and special assessments not yet due and payable, (y) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording, acceptable to mortgage lending institutions generally and the Agencies, and (z) other matters to which like properties are commonly subject which do not interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property.  There are no mechanics or similar liens or claims which have been filed for work, labor or material (and to the best of Seller's knowledge no rights are outstanding that under law could give rise to such lien) affecting the Mortgaged Property that are or may be liens prior to, or equal or coordinate with, the lien of the Mortgage.  All tax identifications and property descriptions in the Mortgage are legally sufficient.

(ff)    All parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage and each Mortgage Note and Mortgage has been duly and properly executed by such parties.  The Mortgage Loan is not subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right there under, render either the Mortgage Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted to Seller, any Prior Servicer or any Originator with respect thereto.

(gg)    The full original principal amount of each Mortgage Loan (net of any discounts) has been fully advanced or disbursed to the Mortgagor named therein, there is no requirement for future advances and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds, except for escrows established or created due to seasonal weather conditions and escrows of funds established in accordance with Applicable Requirements, therefore have been satisfied.  All costs, fees and expenses incurred in making, closing or recording the Mortgage Loan were paid.  There is no obligation on the part of Seller, or of any other party, to make supplemental

18

payments in addition to those made by the Mortgagor. Any future advances that were made in connection with a Mortgage Loan have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan.

(hh)      There is no default, breach, violation or event of acceleration existing under any Mortgage Loan, and to the best of Seller's knowledge no event has occurred that, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and Seller has not waived any default, breach, violation or event of acceleration, in connection with any Mortgage Loan. Neither Seller nor Originator has (i) agreed to any modification, extension or forbearance in connection with a Mortgage Note or Mortgage, (ii) released, satisfied or canceled any Mortgage Note or Mortgage in whole or in part, (iii) subordinated any Mortgage in whole or in part, or (iv) released any Mortgaged Property in whole or in part from the lien of any Mortgage, and the written instrument necessary to effect any of the foregoing has been recorded, if necessary, and is held in the Mortgage File and satisfies the Applicable Requirements. Seller has not advanced its funds to cure a default or delinquency with respect to any such Mortgage Loans, other than required Advances with respect to deficiencies under the Mortgages; or induced, solicited or knowingly received any advance of funds by a party other than the Mortgagor, directly or indirectly, for the payment of any amount required under the Mortgage Loan.

(ii)      All taxes, governmental assessments, insurance premiums, water, sewer and municipal charges, leasehold payments and ground rents relating to the Mortgage Loans have been paid by Seller to the extent such items are required to be paid by Seller pursuant to Applicable Requirements, up to the applicable Sale Date.

(jj)      For any Mortgage Loan secured by Mortgaged Property located in the state of Iowa, an opinion of counsel of the type customarily rendered in such state in lieu of title insurance has been received and is acceptable to the applicable Agency. Each other Mortgage Loan is or will be covered by an American Land Title Association ("ALTA") lender's mortgage title insurance policy that is in an amount and form acceptable to the applicable Agency, with such endorsements, including without limitation endorsements regarding environmental hazards and toxic substances and regarding adjustments to the interest rate. The title insurance policy has been or will be issued by a title insurer acceptable to the applicable Agency with respect to the Mortgage Loan, and insures or will insure the mortgagee, its successors and assigns, as to the first priority lien of the Mortgage in the original principal amount of the Mortgage Loan. The mortgagee, its successors and/or assigns, is the named insured and the sole insured of such mortgage title insurance policy, proper assignment of the title policy has been or by the applicable Transfer Date will be made to Purchaser, and the assignment to Purchaser of such interest in such mortgage title insurance policy does not require the consent of or notification to the insurer, or any required consent has been obtain by Seller at the time of assignment. Such mortgage title insurance policy is in full force and effect, no claims have been made under such mortgage title insurance policy, and neither Seller nor any Originator, as applicable, has done, by act or omission, anything that would impair the coverage of such mortgage title insurance policy.

(kk)      To the best of Seller's knowledge and belief, no hazardous material, including oil and asbestos, is present on, in, at or under the Mortgaged Property securing a Mortgage Loan such that (i) the value of such Mortgaged Property is materially and adversely affected, or (ii) under applicable federal, state or local law, (A) such hazardous material would be required to be eliminated before such Mortgaged Property could be altered, renovated, demolished or transferred or (B) the presence of such

118565008\V-2

hazardous material would (upon action by the appropriate governmental authorities) subject the owner of such Mortgaged Property, or the holder of a security interest therein, to liability for the cost of eliminating such hazardous material or the hazard created thereby.

(ll)     (Reserved.)

(mm)     The loan-to-value ratio of each Mortgage Loan did not, at the time of origination, exceed the maximum amount permitted by the Applicable Requirements for such Mortgage Loan.

(nn)     No fraud occurred on the part of Seller, Originator, Prior Servicer or a Mortgagor in connection with any Mortgage Loan that could materially and adversely affect Purchaser or the Servicing Rights, or result in Purchaser incurring Losses.

(oo)     The Mortgage Loans have been subject to Seller's origination and servicing quality control reviews and internal audits to no less a degree than other residential mortgage loans originated or serviced by Seller.  Within the three (3) years immediately preceding the applicable Sale Date, Seller's internal quality control reviews and audits have not revealed a failure to comply with the Applicable Requirements in connection with the Mortgage Loans that could reasonably be expected to have a material adverse effect on the Servicing Rights or on Seller's ability to perform its obligations under this Agreement.

(pp)     No adverse selection was used by Seller in selecting the Servicing Rights to be sold to Purchaser hereunder.  The Servicing Rights were selected for sale by Seller at random from among all of the servicing rights owned by Seller as of the applicable Sale Date having the characteristics required hereunder.

(qq)     Seller has not received notice from any Mortgagor or other party with respect to the Mortgage Loans of a request for relief pursuant to or invoking any of the provisions of the Servicemembers Civil Relief Act or any other federal or state law that would have the effect of suspending or reducing the Mortgagor's payment obligations under a Mortgage Loan or that would prevent or restrict the ability of the Servicer to commence or continue with the foreclosure of the Mortgage Loan.

(rr)     The Mortgage Loan Documents contain customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the material benefits of the security provided thereby, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.  There is no homestead or other exemption available to a Mortgagor that would prevent the sale of the Mortgaged Property by trustee's sale or the foreclosure of the Mortgage.

(ss)     The Mortgage Note is not and has not been secured by any collateral other than the lien of the corresponding Mortgage.

(tt)     In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by Purchaser, or its successors and assigns to the trustee under the deed of trust, other than in connection with a trustee's sale after default by the Mortgagor.

(uu)     Other than as set forth on the Mortgage Loan Schedule, no Mortgage Loan is an adjustable-rate mortgage loan.

20

118565008\V-2

(vv)     None of the Mortgage Loans are subject to any actual or threatened investor demand for repurchase, indemnification or make-whole payment, or agreement for repurchase, indemnification or make-whole payment.

(ww)     No Mortgage Loan is an Excluded Loan.

(xx)     No residence or dwelling included in any Mortgaged Property is a mobile home or manufactured dwelling.

(yy)     Each Mortgage Loan has an original term to maturity of not more than 30 years, with interest payable in arrears on the first day of each month.  No Mortgage Loan contains terms or provisions which would result in negative amortization.  No Mortgage Loan is evidenced by a Mortgage Note providing for bi-weekly payments.  No Mortgage Loan provides a Mortgagor with a flexible payment option each month pursuant to the terms of the related Mortgage Note.  No Mortgage Loan is a reverse mortgage loan or a home equity line of credit.

(zz)     Each imaged Mortgage Loan Document represents a true, complete, and correct copy of the original document in all respects, including, but not limited to, all signatures conforming to signatures contained in the original document, no information having been added or deleted, and no imaged document having been manipulated or altered in any manner.  Each imaged Mortgage Loan Document is clear and legible, including, but not limited to, accurate reproductions of photographs.

(aaa)     Seller has not entered into a settlement agreement related to the Mortgage Loans with any Governmental Entity or any other Person, and no prior servicer of the Mortgage Loans has entered into a settlement agreement related to the Mortgage Loans with any Governmental Entity, in each case, which would be binding on Purchaser or would otherwise require Purchaser to service the Mortgage Loans other than in accordance with Accepted Servicing Practices generally applicable to the residential mortgage servicing industry.

Section 3.02     Representations, Warranties and Covenants of Seller.

Seller represents, warrants and covenants to Purchaser as of each Sale Date and each Transfer Date contemplated by this Agreement, as follows:

(a)     Seller is duly organized, validly existing, and in good standing under the laws of the state under whose laws it is organized, and was at all relevant times, and Seller is and has been qualified to do business and duly licensed in those states in which each Mortgaged Property is located if the laws of such states require such qualification or licensing for the conduct of banking or business of the type conducted by Seller.  Seller has full corporate power and authority to execute and deliver this Agreement and to perform all of its obligations hereunder.  Seller does not believe, nor does it have any cause or reason to believe, that it cannot perform each and every covenant contained in this Agreement.

(b)     The execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated by this Agreement have been duly and validly authorized by all necessary corporate, shareholder, organizational or other action, and this Agreement has been duly and validly executed and delivered by Seller and is valid and enforceable against Seller in accordance with its terms except as such enforceability may be subject to applicable bankruptcy, insolvency and similar laws generally affecting the enforcement of creditors' rights and to the discretion of a court to grant specific performance.

21

118565008\V-2

(c)    There are no actions, claims, litigation or governmental investigations pending or, to the knowledge of Seller, threatened, against Seller, which relate to, or affect Seller's right to sell the Servicing Rights or to perform under the terms of this Agreement.

(d)    Other than the required Agency approvals referred to in Section 4.02(b) and such other consents of and notices to third parties as are contemplated hereby, any requisite consents or approvals of other Persons to the execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been obtained or will be obtained prior to the applicable Sale Date or such other earlier or later date as expressly provided herein.  Subject to obtaining the Agency approvals referred to in Section 4.02(b), such other consents of and notices to third parties as are contemplated hereby and the execution and delivery of the instruments and agreements referred to herein, neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby shall (i) violate, conflict with, result in a breach of, constitute a default under or be prohibited by, or require any additional approval, waiver or consent under Seller's charter or bylaws or other agreement relating to its organization or any mortgage, indenture, deed of trust, loan or credit agreement or other agreement or instrument to which it is a party or by which it is bound or any federal or state law, rule or regulation or any judicial or administrative decree, order, ruling or regulation applicable to it, or to the Servicing Rights, or (ii) result in the creation or imposition of any lien, charge or encumbrance of any nature upon the Servicing Rights or any Mortgage Loans or the properties or assets of Seller.

(e)    The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of Seller and is not a sale of all or substantially all of the assets of Seller, and the sale and transfer of the Servicing Rights by Seller are not subject to any bulk transfer laws or similar statutory provisions in effect in any jurisdiction, the laws of which apply to such sale and transfer.

(f)    Seller is and was at all relevant times, an Agency-approved mortgagee, and seller/servicer, as applicable, to the extent required to be so approved in order to sell or service the Mortgage Loans.  Seller is not in default in the performance of its obligations under any Agency Contract and, is in compliance with all applicable requirements of Accepted Servicing Practices, and there has been no occurrence with respect to the Seller as of the related Sale Date that could cause the cancellation of the Servicing Rights due to material changes in procedures with respect to the Mortgage Loans.

(g)    No Mortgagor is a named plaintiff or class representative in any pending class action lawsuit in which Seller is a defendant.

(h)    The sum of the assets of Seller, at fair valuation, exceeds the debts of Seller, the present fair saleable value of the assets of Seller is greater than the amount required to pay the liabilities of Seller on its debts as such debts become absolute and mature, and Seller has sufficient capital with which to conduct its business.

(i)    Errors and omissions and fidelity insurance coverage, in amounts as required by the Agencies, are in effect with respect to Seller and will be maintained until the transactions contemplated by this Agreement have been consummated in accordance with the terms hereof.

(j)    If Seller has utilized a broker for which a fee or commission may be due, Seller represents and warrants that such fee or commission shall be the sole responsibility of Seller.

(k)    The financial condition of Seller is adequate to support the performance by Seller on a timely basis of Seller's potential indemnification and other obligations hereunder and Seller is in

22

compliance with all Fannie Mae and Freddie Mac net worth and liquidity requirements pursuant to applicable Agency Requirements.

(l)	No representation, warranty or statement made by Seller in this Agreement, or Schedule or Exhibit to this Agreement, contains any untrue statement of a material fact, or omits a statement of material fact required to be stated therein or necessary to make the information and statements therein not misleading.

(m)	Seller has good and marketable title to the Servicing Rights, free and clear of all liens, charges and encumbrances.  Subject to the transactions contemplated herein, Seller is the sole owner and holder of all right, title and interest in and to the Servicing Rights.  Subject to obtaining the approvals referred to in Section 4.02, the sale of the Servicing Rights by Seller and the instruments required to be executed by Seller and delivered in connection therewith pursuant to this Agreement, the applicable Agency Contract, or other contractual provisions, are, or will be as of the related Sale Date or related Transfer Date, as applicable, executed, delivered, valid and enforceable in accordance with their terms and will effectively vest in Purchaser good and marketable title to the Servicing Rights, free and clear of any and all liens, claims, or encumbrances.  The Servicing Rights being sold in this transaction are the Servicing Rights initially created with respect to the Mortgage Loan.  Seller has not previously assigned, transferred or encumbered the Servicing Rights, and Seller has full right and authority, subject to no interest, or agreement with, any other party, to sell and assign the Servicing Rights to Purchaser pursuant to this Agreement.  The Servicing Rights are not subject to any stripped servicing fees, excess yield or interest only strips.

(n)	No current or former officer and, to Seller's knowledge, no Originator or Prior Servicer, or other personnel of Seller, an Originator or Prior Servicer, has been indicted, arraigned, or convicted (or has been in the last twelve (12) months or currently is under investigation) for any criminal offenses related to the origination, servicing, or pooling of the Mortgage Loans or any fraudulent activity.

(o)	Within the three (3) years immediately preceding the applicable Sale Date, Seller has not been the subject of an audit by any Agency, to the extent where the results of such audit finding could reasonably be expected to have a material adverse effect on all or any significant portion of the Servicing Rights or on Seller's ability to perform its obligations under this Agreement.

(p)	Seller is a member of MERS in good standing, has complied and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans and is current in payment of all fees and assessments imposed by MERS.

(q)	Seller has complied with all anti-money laundering laws and regulations applicable to it as originator, seller and Servicer, and has established an anti-money laundering compliance program as required by such anti-money laundering laws and regulations.

Section 3.03	Representations, Warranties and Covenants of Purchaser.

Purchaser represents, warrants and covenants to Seller as of each Sale Date and each Transfer Date contemplated by this Agreement, as follows:

(a)	Purchaser is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation.  Purchaser has all requisite power and authority to own its properties and carry on its business as and where now being conducted and is duly qualified to do business and is properly licensed and is in good standing in each jurisdiction in which the character and location of the properties owned or leased by it or the nature of the business transacted or contemplated herein makes such

23

118565008\V-2

qualifications or licenses necessary. Purchaser has all requisite power and authority to enter into this Agreement, and the agreements to which it is or will become a party as contemplated by this Agreement, and to carry out the transactions contemplated hereby. Purchaser does not believe, nor does it have any cause or reason to believe, that it cannot perform each and every covenant in this Agreement.

(b)    The execution and delivery by Purchaser of this Agreement, and of the agreements to be entered into pursuant hereto, and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary action, and this Agreement and such other agreements constitute valid and legally binding agreements enforceable in accordance with their respective terms except that the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally.

(c)    Other than the required Agency approvals referred to in Section 4.02(b) and such other consents of and notices to third parties as are contemplated hereby, any requisite consents or approvals of other Persons to the execution and delivery of this Agreement and the performance of the transactions contemplated hereby have been obtained or will be obtained prior to the applicable Sale Date or such other earlier or later date as expressly provided herein. Subject to obtaining the Agency approvals referred to in Section 4.02(b), such other consents of and notices to third parties as are contemplated hereby and the execution and delivery of the instruments and agreements referred to herein, neither the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby shall not (i) violate, conflict with, result in a breach of, constitute a default under or be prohibited by, or require any additional approval, waiver or consent under Purchaser's certificate of formation or limited liability company agreement or other agreement relating to its organization or any mortgage, indenture, deed of trust, loan or credit agreement or other agreement or instrument to which it is a party or by which it is bound or any federal or state law, rule or regulation or any judicial or administrative decree, order, ruling or regulation applicable to it, or to the Servicing Rights, or (ii) result in the creation or imposition of any lien, charge or encumbrance of any nature upon the Servicing Rights or any Mortgage Loans or properties or assets of Purchaser.

(d)    There are no actions, claims, litigation or governmental investigations pending or, to the knowledge of Purchaser, threatened, against Purchaser, which relate to, or affect Purchaser's right to purchase the Servicing Rights or to perform under the terms of this Agreement.

(e)    Purchaser is an approved servicer by each Agency and is not in default in any material respect in the performance of its obligations to any Agency. Purchaser is in compliance in all material respects with all applicable Accepted Servicing Practices, and there has been no occurrence or condition with respect to Purchaser as of the related Sale Date that could cause the cancellation of the Servicing Rights with respect to the Mortgage Loans.

(f)    From and after the applicable Transfer Date, Purchaser shall service the Mortgage Loans in accordance with Accepted Servicing Practices.

(g)    The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of Purchaser.

Section 3.04    Discovery and Notice of Breach.

Upon discovery by the Seller or the Purchaser of a breach of any representations and warranties which may adversely affect the value of the Servicing Rights or the value of the Purchaser's interest therein, or may adversely affect the value of Purchaser's interest in or the value of the related Servicing Rights in

24

118565008\V-2

the case of a representation and warranty related to a particular Servicing Right, the party discovering such breach shall give prompt written notice to the other party.

ARTICLE IV
SALE DATE AND TRANSFER DATE DELIVERIES

Section 4.01    <u>Documents, Schedules and Exhibits Required on or Prior to each Sale Date</u>.

(a)    Seller shall deliver or cause to be delivered to Purchaser in accordance with the Transfer Instructions, or as otherwise designated by Purchaser, a test Data File, in a form mutually agreed upon by Purchaser and Seller and sample Mortgage Loan Schedule.

(b)    Seller shall provide to Purchaser the custodial certification and Custodial File Exceptions List as of a date mutually agreed upon by Seller and Purchaser from the Seller's custodian with respect to the related Custodial Files prior to each Sale Date.

(c)    On the related Sale Date, Seller shall deliver or cause to be delivered to Purchaser a Bill of Sale in substantially the form set forth in <u>Exhibit 5</u> attached hereto.

(d)    Seller shall provide Purchaser with details including any necessary documentation of Advances netted by Seller.

Section 4.02    <u>Documents, Schedules and Exhibits Required With Respect to each Transfer Date</u>.

Seller shall deliver on the dates specified herein, the following documents and files to Purchaser:

(a)    Seller shall provide a final Data File following each respective Transfer Date, in a form mutually agreed upon by Purchaser and Seller in accordance with the Transfer Instructions.

(b)    Seller, with Purchaser's cooperation, shall submit or cause to be submitted to the applicable Agency the forms and information for final Agency approval of the contemplated transfer of the Servicing Rights no later than the related Sale Date.  With respect to any Servicing Rights related to Mortgage Loans sold or conveyed to Fannie Mae, Seller shall have designated Purchaser as the transferee servicer on Form 629 (or any successor or comparable forms as required by the Fannie Mae Guides) prepared and submitted in connection with the transfer of the servicing for the related Mortgage Loans pursuant to its Agency Contract.  With respect to any Servicing Rights related to Mortgage Loans sold or conveyed to Freddie Mac, Seller shall have designated Purchaser as the transferee servicer as required by the Freddie Mac Guides in connection with the transfer of the servicing for the related Mortgage Loans pursuant to its Agency Contract.  At least fifteen (15) days prior to each Transfer Date, Seller shall either (i) deliver the applicable Agency consents to the transfers being made hereunder, or (ii) certify to Purchaser either that such consents have not been obtained or that the applicable Agency has not responded to Seller's request therefore.  In the event an Agency refuses to approve any transfer, Seller shall promptly inform Purchaser, which will be prior to such date as Transfer Notices are required to be mailed.  Seller shall incur all costs of the approval process.

(c)    Seller shall notify MERS of the transfer of servicing and the subsequent transfer of registry, including any MERS MOM loans within two (2) Business Days of the related Transfer Date.  Seller will pay all costs of MERS registration transfer and for any registration for any Mortgage Loan found not to be registered with MERS, and Seller shall be responsible to register said Mortgage Loan with MERS.  Seller

25

is also responsible for ensuring the related Agency is listed in MERS as the investor, prior to the transfer of servicing to Purchaser in MERS.  Seller shall provide Purchaser with the MERS mortgage loan identification number in an electronic format acceptable to the Parties.  With respect to any Mortgage Loan found not to be registered in MERS, Seller must promptly register the Mortgage Loan properly in MERS and transfer the same to Purchaser.

(d)     With respect to each Mortgage Loan that is covered by a Seller-placed insurance policy, Seller shall maintain such policy until each Transfer Date to the extent permitted by applicable law. Seller shall provide to Purchaser a list of all Mortgage Loans covered by Seller-placed insurance in connection with the transfer of the Servicing Rights to Purchaser in accordance with the Transfer Instructions and cancel such Seller-placed insurance policies as of each Transfer Date.

(e)     If applicable, in accordance with the Transfer Instructions, Seller shall provide a copy of Seller's delinquency report showing the due date of the Monthly Payments and the paid-to date as of each Sale Date or each related Transfer Date.

(f)     In accordance with the Transfer Instructions, Seller shall provide a trial balance that includes Seller's loan number and principal balance for each Mortgage Loan for which the Servicing Rights are to be delivered to Purchaser on each respective Transfer Date.

(g)     In accordance with the Transfer Instructions, Seller shall provide a copy of loan payment history from origination to each such Transfer Date on each Mortgage Loan with histories and the most recent escrow analysis for each Mortgage Loan, if applicable. This may be furnished on a CD or in a text file, in lieu of hard copy.

(h)     In accordance with the Transfer Instructions, Seller shall provide a sample copy of Seller's letter or computer listing sent to the tax servicer, life-of-loan flood insurance certification provider, hazard insurance provider, and private mortgage insurance provider, requesting assignment to Purchaser.

(i)     In accordance with the Transfer Instructions, Seller shall identify by Seller loan number, the Advance amount, and provide a detailed listing of individual items (including a loan level description of the type of Advances, i.e., tax, insurance, attorney fees, property inspection, etc.) paid as of each such Transfer Date and the amount thereof to be paid by Purchaser pursuant to Section 2.02 or Section 5.06 of this Agreement.

(j)     In accordance with the Transfer Instructions, all hardcopy records delivered or transferred to Purchaser shall be clearly identified and in Seller's loan number order.  All boxes shall be sequentially labeled and contain a complete listing of the Mortgage Files therein. Seller shall provide Purchaser with a summary schedule reflecting the Mortgage Files therein and exceptions thereto.

(k)     On or prior to each respective Transfer Date, Seller (i) shall notify its custodian that Purchaser is the owner of the Servicing Rights and servicer of the related Mortgage Loans, (ii) shall or shall cause its custodian to execute any forms or other documentation to evidence such transfer of ownership, (iii) shall or shall cause its custodian to execute such other documents or instruments necessary to obtain the final certification or recertification of the documents contained in the Custodial File pursuant to Applicable Requirements, (iv) shall instruct its custodian to deliver or transfer control of all applicable hard-copy Custodial Files in such custodian's possession to Purchaser's Custodian and (iv) shall deliver the related updated Custodial File Exceptions List as of the Transfer Date to Purchaser each within five (5) Business Days following the related Transfer Date.

26

(l)    Seller shall package and ship or electronically deliver in accordance with this Section 4.02(l) to the Purchaser the Mortgage Files for each Mortgage Loan in accordance with the Transfer Instructions.  The Mortgage Loan Documents shall be delivered electronically in imaged format titled with the Agency loan number and indexed. Seller shall index all imaged Mortgage Loan Documents in a format consistent with the Purchaser's or its subservicer's existing indexing practices or as reasonably required by Purchaser. To the extent any such Mortgage Loan Document is not indexed or formatted as reasonably required by Purchaser, Seller shall reimburse Purchaser $ 50 for each Mortgage Loan for Purchaser's or its designee's reasonable out of pocket costs to correct such formats and create such indexing. In addition, Seller shall deliver in original paper form the Mortgage Notes, recorded Mortgages, recorded Assignments and other Mortgage Loan Documents required to be retained in original or paper form pursuant to Applicable Requirements or for purposes of servicing the related Mortgage Loan in accordance with Applicable Requirements, including collections and foreclosures on the related Mortgage Loan.  Seller shall be responsible for all fees and expenses related to the indexing, transfer and shipping of the Mortgage File for each Mortgage Loan as required pursuant to Section 4.05.

Section 4.03    Access to Information.

Upon reasonable prior notice to Seller, Seller shall afford reasonable cooperation to Purchaser and its counsel, accountants and other representatives in providing reasonable access during normal business hours on Business Days throughout the respective Interim Servicing Period and for a period of one (1) year following such Interim Period, to the Mortgage Files and all Seller's files, books and records relating to the Mortgage Loans, any Advances and the Servicing Rights; provided, however, that Seller shall be entitled to take reasonable and appropriate actions to assure that Purchaser maintains the confidentiality of the names and addresses of the Mortgagors under the Mortgage Loans and all non-public information obtained in such investigation that could reasonably be construed to be of a confidential or proprietary nature, and Seller shall provide Purchaser with access to and reasonable cooperation with its officers and employees. Purchaser and its representatives and affiliates shall comply in all respects with the Privacy Act in connection with any such actions.

Section 4.04    Further Assurances.

Prior to each Transfer Date, Seller shall furnish to Purchaser such reports, information or documentation supplementary to the information contained in the documents and schedules delivered pursuant hereto and deliver such reports as may reasonably be requested by Purchaser and as are reasonably normal and customary in the mortgage servicing industry, and Purchaser and Seller shall afford reasonable cooperation each to the other both prior to and following such Transfer Date.

Seller and Purchaser will each, at the request of the other, execute and deliver to each other all such other instruments or documentation that either may reasonably request in order to perfect any transfer, assignment or delivery to Purchaser of the Servicing Rights and the consummation of the agreements hereunder, and the assumption by Purchaser of the Servicing Rights pursuant to the applicable Agency Contract.

In an effort to minimize Mortgagor delinquencies following the related Transfer Date, Seller shall appoint a Relationship Officer and make such Relationship Officer available to Purchaser, during normal business hours, commencing on the related Sale Date and for a period of ninety (90) days following the related Transfer Date.  The Relationship Officer shall be responsible for (i) overseeing and monitoring the performance and compliance by Seller with Transfer Instructions and transfer provisions of this Agreement and (ii) working cooperatively with Purchaser to ensure the timely performance and compliance by Seller

118565008\V-2

with the Transfer Instructions and the transfer provisions of this Agreement, including but not limited to, sending the proper Mortgagor notices in a timely manner as required by Section 5.02 of this Agreement and promptly forwarding all payments related to the Servicing Rights received by Seller to Purchaser as required by Section 5.07 of this Agreement.

Seller shall promptly deliver five (5) original powers of attorney to Purchaser, substantially in the form as set forth in Exhibit 4 hereto, and sufficient to allow Purchaser to execute all documentation requiring execution on behalf of Seller with respect to the servicing of the Mortgage Loans, including assignments, mortgages, title policies, satisfactions, partial releases, modifications and foreclosure documentation and as reasonably requested by Purchaser, as well as to allow Purchaser to endorse and deposit payments related to the Mortgage Loans that name Seller as payee.  Additionally, Seller shall provide such other powers of attorney from time to time as are otherwise necessary to effectuate the intent of this Agreement, and/or the transfer of servicing to Purchaser.  On or prior to each Transfer Date, Seller shall provide to Purchaser, for its benefit, a reasonable number of powers of attorney substantially in the form of Exhibit 4 attached hereto.

Section 4.05    Transfer Expenses.

Seller shall pay all costs of delivery or transfer to Purchaser of all of the Mortgage Loan Documents, Mortgage Files, Custodial Files and related documents to the Person designated by Purchaser, in writing, all costs of preparing and recording Assignments of Mortgage, if not MERS MOM as contemplated hereby, all Agency transfer fees required hereunder, all costs relating to Seller's computer service transfer, custodial transfer and/or transfer fees of Seller's custodian, any recertification fees relating to the transfer to Purchaser's Custodian, all costs relating to the remittance and transfer of funds in the Custodial Accounts and Escrow Accounts, any deboarding fees payable to Seller's subservicer, all costs related to preparing, obtaining and delivering such documents as Seller is required to provide, and all other fees, costs and expenses incurred by Seller in its performance of its obligations under this Agreement, including without limitation the fees of Seller's Custodian, attorneys and accountants.  Seller shall also bear all costs associated with obtaining and/or transferring on each Mortgage Loan fully assignable life-of-loan fully transferable tax and flood service contracts to Purchaser's current tax and flood service contract vendor. Purchaser shall bear all of its costs in connection with performing its Due Diligence.  Except as otherwise provided in this Agreement, Seller and Purchaser shall each bear their own expenses incurred in connection with the transactions contemplated by this Agreement.

Section 4.06    Quality Control Reviews.

In the normal course of its operations, Seller performs quality control reviews according to Applicable Requirements.  Prior to each Sale Date, Seller shall provide to Purchaser with respect to any Mortgage Loans, which Servicing Rights have been sold to Purchaser, if applicable, a summary and copy of any findings relating to any Mortgage Loan containing a finding affecting the eligibility of the Mortgage Loans.

Section 4.07    Cooperation.

Seller shall cooperate with Purchaser after the Sale Date to resolve all customer disputes and inquiries related to activities that occurred prior to the Transfer Date.  Such activities may include, but shall not be limited to, providing check copies, prior servicing histories, prior correspondence and escrow analyses.  Seller will provide such information to Purchaser within a time period sufficient for Purchaser to satisfy its obligations under the Real Estate Settlement Procedures Act and all other Applicable Requirements.

118565008\V-2

Section 4.08    Financial Statements.

At Purchaser's contemporaneous request each year for three (3) years after the Sale Date, Seller shall furnish to Purchaser, as soon as available and in any event within ninety (90) days after the close of each fiscal year, a statement of income and changes in shareholders' equity of Seller (and, if applicable, its subsidiaries, on a consolidated basis) for such year, the related balance sheet as at the end of such year (setting forth in comparative form the corresponding figures for the preceding fiscal year), all in reasonable detail and accompanied by an unqualified opinion of an accounting firm or other independent public accountants of recognized standing selected by Seller, as to said financial statements and a certificate signed by the chief financial officer of Seller stating that said financial statements fairly present the financial condition and results of operations of Seller (and, if applicable, its subsidiaries) as at the end of, and for, such year.  Seller shall furnish Purchaser, as soon as available and in any event within forty five (45) days after the close of each fiscal quarter for Seller, similar, although unaudited, reports for such fiscal quarter, certified by the chief financial officer of Seller.  All financial statements and reports furnished to Purchaser hereunder shall be prepared in accordance with United States generally accepted accounting principles, applied on a consistent basis.  From time to time, with reasonable promptness, Seller shall furnish such further information regarding the business, operations, properties or financial condition of Seller as Purchaser may reasonably request.

Section 4.09    Notices.

Seller shall give prompt written notice to Purchaser of, in a writing containing the details thereof:

(a)    any action, suit, proceeding or investigation related to the Mortgage Loans, their origination, funding, sale or servicing instituted, or to Seller's knowledge threatened, in any federal or state court or by or before any commission or other regulatory body (federal, state or local, domestic or foreign) or Fannie Mae, Freddie Mac or any insurer, against Seller or any of its affiliates, any Originator or Prior Servicer, including those involving the method of origination or servicing of residential mortgage loans used in origination or servicing the Mortgage Loans, and including any putative class action involving the origination or servicing of mortgage loans that reasonably could be construed to include Mortgage Loans within the putative class;

(b)    written reports, findings or notices arising out of any audits, examinations, reviews or investigations by any commission or other regulatory body (federal, state or local, domestic or foreign) or Fannie Mae, Freddie Mac or any insurer containing adverse or critical findings or determinations, including preliminary findings or determination, regarding the origination, funding, sale or servicing of the Mortgage Loans, or the method of origination or servicing of residential mortgage loans used in origination or servicing the Mortgage Loans, including copies thereof, and followed by copies of any responses to such reports, findings or notices, and copies of any subsequent written communications between Seller or its representatives and such parties regarding such matters;

(c)    the occurrence of facts actually known to Seller that would provide a basis for Purchaser to terminate this Agreement pursuant to Section 8.01 hereof, following the giving of notice and the failure to cure; and

any notice of facts or circumstances that reasonably could be anticipated to result in a material adverse change in Seller's ability to meet its obligations under this Agreement.

118565008\V-2

ARTICLE V
ADMINISTRATION OF TRANSFER OF SERVICING

Section 5.01    Interim Servicing.

Interim Servicing Agreement (a) will be executed by the parties on each Sale Date, and (b) is hereby incorporated into this Agreement by reference and is made a part of this Agreement in the form attached hereto as Exhibit 3.

Seller, either acting on its behalf or through a subservicer, shall continue the servicing of all Mortgage Loans up to the applicable Transfer Date in accordance with Accepted Servicing Practices and the Interim Servicing Agreement.

Seller shall abide by any and all Transfer Instructions attached as an exhibit hereto, and shall promptly reimburse Purchaser for any fees, losses, and/or expenses incurred by Purchaser as a result of failure to abide by such instructions.

All Escrow Payments relating to the Mortgage Loans, which have become or will become due within forty-five (45) days before and after the applicable Transfer Date, have been or will be paid by Seller prior to such Transfer Date or otherwise in accordance with the Transfer Instructions to the extent of Escrow Payments made by the applicable Mortgagor with respect thereto or Advances as required by the applicable Agency Guides.  Seller shall pay Purchaser any penalty charges or the amount of any discounts lost as a result of a failure to pay tax bills which are due and payable in accordance with this subsection to the extent of Escrow Payments made by the applicable Mortgagor with respect thereto or Advances as required by the applicable Agency Requirements, which are subsequently incurred by Purchaser.

Section 5.02    Notice Letters of Transfer.

At least fifteen (15) days prior to each Transfer Date, Seller shall send each Mortgagor a Transfer Notice. Such Transfer Notices shall be mailed on or before such date and will be in such form as is reasonably acceptable to Seller and Purchaser. If possible, Seller and Purchaser shall cooperate on a joint mailing program for notification to the Mortgagors and shall share the cost of such Transfer Notices equally.

Section 5.03    Statements.

Seller shall provide each Mortgagor with an annual year-end statement in accordance with Applicable Requirements, including but not limited to Internal Revenue Service and/or Treasury Department regulations; provided that Seller shall not be required to provide a year-end escrow analysis to Mortgagors. Such statements shall reflect the status of the Mortgage Loans up to each related Transfer Date.  Purchaser shall not have any responsibility for providing such information for the period of time that the Mortgage Loan was serviced by Seller or an agent of Seller (except for year-end escrow analysis).  Purchaser shall provide each Mortgagor with an annual year-end statement in accordance with Applicable Requirements, including but not limited to Internal Revenue Service and/or Treasury Department regulations.  Such statements shall reflect the status of the Mortgage Loans from and following each related Transfer Date.  Seller shall not have any responsibility for providing such information for the period of time after the applicable Mortgage Loan's Transfer Date.

118565008\V-2

Section 5.04    Tax and Flood Contracts.

Seller shall cooperate with Purchaser to accomplish a tape transfer of tax and flood contracts to Purchaser's designated vendor in accordance with the Transfer Instructions.   Seller shall assign to Purchaser all life-of-loan assignable tax and flood contracts relating to each Mortgage Loan.  Seller shall bear all costs associated with obtaining and/or transferring on each Mortgage Loan a fully assignable life-of-loan, fully transferable tax and flood service contract to Purchaser's current tax and flood service contract vendor, as provided under Section 2.03(h).

Section 5.05    Transfer of Custodial and Escrow Accounts.

Seller shall transfer the balances of the Custodial Accounts and Escrow Accounts and all other funds and collections related to the applicable Servicing Rights to Purchaser, or Purchaser's designee, no later than one (1) calendar day following the mutual agreement of Seller and Purchaser of the conversion totals and balances of the accounts as of the related Transfer Date; provided that in no event shall the transfer of such balances occur more than three (3) calendar days prior to the related Transfer Date, or otherwise in accordance with the Transfer Instructions, if applicable. Seller shall reconcile such amounts with Purchaser in accordance with the Applicable Requirements. Seller shall wire transfer immediately available funds any Escrow Funds to Purchaser within three (3) Business Days of the related Transfer Date. Seller shall remit and deliver to Purchaser, or Purchaser's designee, with the Custodial Account funds, amounts of interest required to be paid by Purchaser pursuant to Applicable Requirements for the period prior to the applicable Transfer Date to the applicable Agency due to shortfalls in interest collected as a result of prepayments in full or partial prepayments for the period prior to the Transfer Date ("Interest Shortfall"), which such Interest Shortfall shall not be included in the Advances to be paid for by Purchaser.

Section 5.06    Payment of Advances.

To the extent not paid by Purchaser as part of the Advances Purchase Price in accordance with Section 2.03(d), Purchaser shall wire transfer immediately available funds to Seller, on the date that is twenty-five (25) Business Days following each respective Transfer Date, an amount equal to the unreimbursed Advances for such Mortgage Loan as of each related Transfer Date; provided that Seller shall provide all reasonably necessary supporting documentation with respect to such Advances (including a loan level description of the type of Advances, i.e., tax, insurance, attorney fees, property inspection, etc.) necessary for Purchaser to determine that such Advances are reimbursable in accordance with the applicable Agency Requirements. If after the payment of any Advances to Seller pursuant to Section 2.03(d) or this Section 5.06, Purchaser reasonably and in good faith determines that any of the Advances are not eligible for reimbursement by the applicable Agency based on a fact or circumstance arising prior to the Transfer Date, Seller shall refund to Purchaser an amount equal to such ineligible Advances within five (5) Business Days of Purchaser's request.

Section 5.07    Payments and Notices Received By Seller.

Seller and Purchaser acknowledge that, during the ninety (90) day period after each Transfer Date, all funds received by Seller or its subservicer in connection with the related Mortgage Loans, including, but not limited to, tax, insurance, principal, interest, mortgage guaranty or mortgage insurance payments, insurance loss drafts, tax refunds, and all other types of payments are to be immediately paid over to Purchaser without offset or deduction.  Purchaser shall be entitled to the service fees and other servicing related income on all such payments. During such ninety (90) day period, such funds shall be identified by Seller's loan numbers and shall within two (2) Business Days' of receipt be transferred to Purchaser, at

118565008\V-2

Seller's expense, by overnight courier, for next Business Day delivery, at the address for notices to Purchaser, or as otherwise set forth in the Transfer Instructions. During such ninety (90) day period, Seller shall endorse to Purchaser all checks forwarded to Purchaser in accordance with the immediately preceding sentence.  In addition, Seller shall deliver or cause to be delivered to Purchaser, as promptly as practicable after receipt by Seller, copies of all correspondence received from each respective Agency or any Mortgagor or otherwise relating to any Mortgage Loans. Following such ninety (90) day period, all such funds and correspondence shall be returned to the sender with a letter of explanation, a copy of which letter shall be sent to Purchaser. All other funds pertaining to the Mortgage Loans received by Seller, including recoveries of Advances, shall be forwarded by Seller, at Seller's expense, to Purchaser or its designee by wire if such funds or payments are received by wire, or by overnight delivery if such funds or payments are received by check within one (1) Business Day following Seller's receipt thereof.

Section 5.08    Possession of Documents and Funds Following the Sale Date; Limitations on Interim Servicing.

From and after each Sale Date, the sole and exclusive ownership of the related Servicing Rights shall vest in Purchaser.  The possession of all Mortgage Files, Custodial Files, and other books, records, accounts and funds by Seller following such Sale Date is solely in a fiduciary capacity for and at the will of Purchaser.

ARTICLE VI
REMEDIES

Section 6.01    Seller Indemnification.

Seller shall indemnify, and hold Purchaser, its shareholders and Affiliates, and their respective directors, officers, employees, agents and owners, and their respective representatives, successors, and permitted assigns (collectively, the "Purchaser Indemnified Parties") harmless from, and will reimburse Purchaser Indemnified Parties for any and all Losses incurred by any of them, whether or not arising out of claims by or on behalf of a third party, and regardless of whether any risk of the foregoing was known or unknown to Purchaser as of the related Sale Date, incurred by Purchaser Indemnified Parties to the extent that any such Losses result from (a) a breach of Seller's covenants, representations, warranties, and/or agreements contained in this Agreement, (b) any fraud on the part of any Person in the origination, sale, pooling or servicing of any Mortgage Loan up to and including the Transfer Date, (c) any misrepresentations made by Seller in this Agreement or in any Schedule, Exhibit or certificate furnished pursuant thereto, (d) the nonfulfillment of any term, covenant, condition, agreement or obligation of Seller set forth in this Agreement or in any Schedule, statement, Exhibit or certificate furnished pursuant thereto, or any default or failure to perform by Seller thereunder, (e) the failure of Seller to deliver or to cause a Prior Servicer to deliver, the Mortgage Files and Mortgage Loan Documents, (f) any failure by Seller or any Originator or Prior Servicer, or any employee, agent or representative acting on their behalf, to originate, sell, pool and service the related Mortgage Loans up to and including the applicable Transfer Date in compliance with the Applicable Requirements, (g) any other Excluded Obligations, and (h) litigation or a Governmental Entity investigation or Order arising out of events occurring up to and including the applicable Transfer Date in connection with the Mortgage Loans, in each case, except for any breach for which Purchaser has an obligation to indemnify Seller pursuant to Section 6.02.  The indemnification provided by Seller herein shall be with respect to claims involving third-parties and claims between Purchaser and Seller.

The obligations of Seller under this Section 6.01 shall survive the related Sale Dates and related Transfer Dates for the life of the Mortgage Loans.  The indemnity provided in this Section 6.01 shall remain in full force and effect regardless of any investigation made by Purchaser or its representatives.  Further,

118565008\V-2

for purposes of indemnification under this Section 6.01, a breach or inaccuracy of a representation or warranty contained in this Agreement shall be deemed to occur or exist either if such representation or warranty is actually inaccurate or breached or if such representation or warranty would have been so breached or inaccurate if such representation or warranty had not contained any limitation or qualification as to materiality, material adverse effect, material adverse change or knowledge (it being the intention of the parties that the Purchaser Indemnified Parties shall be indemnified and held harmless from and against any and all Losses resulting from, arising out of or relating to the failure of any such representation or warranty to be true, correct and complete in any respect, determined in each case without regard to materiality, material adverse effect, material adverse change or knowledge) and in connection with enforcing the provisions of this Section 6.01.  Additionally, for purposes of indemnification under this Section 6.01, a breach or inaccuracy of a representation or warranty contained in this Agreement shall be deemed to occur or exist regardless of any exception to such representation or warranty disclosed by Seller.

Section 6.02    Purchaser Indemnification.

Purchaser shall indemnify and hold Seller, its shareholders and Affiliates and their respective directors, officers, employees, agents and owners, and their respective representatives, successors, and permitted assigns (collectively, the "Seller Indemnified Parties") harmless from, and will reimburse Seller Indemnified Parties for any and all Losses incurred by any of them, whether or not arising out of claims by or on behalf of a third party, and regardless of whether any risk of the foregoing was known or unknown to Seller as of the related Sale Date, incurred by Seller Indemnified Parties to the extent that any such Losses result from a breach of Purchaser's covenants, representations, warranties and agreements contained in this Agreement, except for any breach caused by the actions of Seller, any Originator or any Prior Servicer. The indemnification provided by Purchaser herein shall be with respect to claims involving third-parties and claims between Purchaser and Seller.

The obligations of Purchaser under this Section 6.02 shall survive the related Sale Dates and related Transfer Dates for the life of the Mortgage Loans.  The indemnity provided in this Section 6.02 shall remain in full force and effect regardless of any investigation made by Seller or its representatives.  Further, for purposes of indemnification under this Section 6.02, a breach or inaccuracy of a representation or warranty contained in this Agreement shall be deemed to occur or exist either if such representation or warranty is actually inaccurate or breached or if such representation or warranty would have been so breached or inaccurate if such representation or warranty had not contained any limitation or qualification as to materiality, material adverse effect, material adverse change or knowledge (it being the intention of the parties that the Seller Indemnified Parties shall be indemnified and held harmless from and against any and all Losses resulting from, arising out of or relating to the failure of any such representation or warranty to be true, correct and complete in any respect, determined in each case without regard to materiality, material adverse effect, material adverse change or knowledge) and in connection with enforcing the provisions of this Section 6.02.

Section 6.03    Refunds and Reimbursements.

(a)    Should Seller or Purchaser, as applicable, receive notice of a misapplied payment occurring prior to any Transfer Date and discovered after each such Transfer Date, such party shall immediately notify the other.  Seller and Purchaser shall cooperate in promptly correcting misapplication errors. Any reconciliation of misapplied payments with respect to a Mortgage Loan shall be made no later than six (6) months after each related Transfer Date, and such reconciliation shall be accomplished no later than five (5) Business Days following written request and documentation supporting such request.

118565008\V-2

(b)    If the outstanding principal balance of any of the Mortgage Loans used in computing the amount of the Purchase Price shall be found, no later than six (6) months after the payment made pursuant to Section 2.02, to be incorrectly computed, the Purchase Price shall be promptly and appropriately adjusted on the basis of the Purchase Price Percentage, and a correcting payment therefore shall be made by the appropriate party no later than five (5) Business Days after receipt of written notice of the requirement to make such payment and documentation supporting such requirement.

(c)    If, subsequent to a Transfer Date with respect to a Mortgage Loan, Purchaser determines that Seller has been reimbursed for an Advance with respect to such Mortgage Loan pursuant to Section 2.02(d) or Section 5.06 and such Advance or a portion thereof is not reimbursable pursuant to the applicable Agency Guide, Seller shall pay to Purchaser, no later than five (5) Business Days after written notice of the requirement to make such payment, the amount of the Advances or portion thereof that is not a recoverable Advance.

(d)    With respect to any Servicing Rights sold to Purchaser, if the servicing of the related Mortgage Loans is not transferred on the related Transfer Date for any reason, including without limitation, failure by Seller to obtain the necessary approval from the applicable Agency for such transfer, then at the sole discretion of Purchaser, Seller shall repurchase from Purchaser the related Servicing Rights at the related Purchase Price paid by Purchaser for such Servicing Rights within seven (7) Business Days of receiving written notification from Purchaser.

Section 6.04    Repurchases, Make-Whole Payments and Compensatory Fees.

(a)    If Purchaser is required by an Agency to repurchase a Mortgage Loan or to make such Agency whole due to an Excluded Obligation or a Defect in such Mortgage Loan, Purchaser shall promptly notify Seller and shall inform Seller of the related repurchase or make-whole price and the Agency repurchase or make-whole date.  If Seller receives notice by an Agency to repurchase a Mortgage Loan or to make such Agency whole due to an Excluded Obligation or a Defect in such Mortgage Loan, Seller shall promptly notify Purchaser.  Subject to the notice and cure provisions of this paragraph, no later than five (5) Business Days prior to such repurchase or make-whole date, Seller shall either remit necessary amounts directly to the applicable Agency, or pay to Purchaser, by wire transfer of immediately available funds, the sum of the related repurchase or make-whole price, and shall in either case remit the related Servicing Rights Repurchase Price to Purchaser by wire transfer of immediately available funds no later than the repurchase or make-whole date.  In addition, Seller shall, within one (1) Business Day after the repurchase or make-whole date, pay to Purchaser all actual and reasonable out-of-pocket costs and expenses (including but not limited to overnight courier charges) borne by Purchaser in connection with the attempted cure of the applicable breach and in connection with the repurchase or make-whole of such Mortgage Loan from the applicable Agency, including, but not limited to, reasonable attorney's fees. Purchaser shall not be required to advance any of its own funds to pay any portion of any repurchase or make-whole price, and shall not be required to make any such repurchase or make-whole if it has not received the applicable repurchase or make-whole price from Seller as provided above.  However, (i) in the event that Seller fails to pay such amounts to the applicable Agency and does not advance such funds to Purchaser in advance of the required repurchase or make whole date, and (ii) if due to the lack of a bifurcation agreement, the applicable Agency requires that such repurchase or make whole price nevertheless be paid by Purchaser, Seller shall by wire transfer of immediately available funds, reimburse Purchaser the repurchase and/or make whole price, as well as the Servicing Rights Repurchase Price. Such amounts will incur interest at an annual rate of the Prime Rate plus five percent (5.00%), or such lesser amount as may be required by applicable law from and after the date the amount is due to be paid to the Agency in the event that Seller fails to pay such amounts to the applicable Agency and does not

advance such funds to Purchaser in advance of the required repurchase or make whole date as required herein.  Upon the consummation of any such repurchase or make whole payment as provided above, the applicable repurchased Mortgage Loan shall be delivered to Seller.  With respect to each Mortgage Loan for which Purchaser is notified by an Agency that it will or may be required to repurchase or make-whole (i) Purchaser will use reasonable efforts to notify Seller of the applicable repurchase or make-whole payment requirement no later than ten (10) Business Days after Purchaser's receipt of notice thereof from the Agency); (ii) upon Seller's request Purchaser shall furnish to Seller a copy of the related Data File, Mortgage File and Custodial File and other information requested by Seller, including payment histories and collection records, to enable Seller to respond to the Agency to the extent that such Data File, Mortgage File and Custodial File and other information are in the possession of Purchaser; (iii) Purchaser will allow Seller to cure, within any cure period allowed by the Agency, the Defect, condition or breach resulting in the repurchase, repurchase alternative, indemnification, or make-whole requirement; and (iv) Purchaser will reasonably cooperate with execution of documents, request for extensions or a repurchase alternative offered by an Agency; provided, however, that none of the foregoing shall reduce or diminish Seller's liability to Purchaser with respect to any repurchase, repurchase alternative or make-whole payment liability hereunder.  In addition to reimbursements described in this section, in the event that indemnification is ultimately required by the applicable Agency in lieu of a repurchase or make whole obligation, Seller shall, in the sole discretion of Purchaser and in accordance with the Agency Guides, repurchase the Servicing Rights from Purchaser.  Seller shall in either case indemnify Purchaser for any indemnification required of Purchaser by the applicable Agency.

(b)    If it is discovered after any Transfer Date with respect to a Mortgage Loan that a Primary Mortgage Insurance Policy is not in force or has been cancelled with respect to such Mortgage Loan as of the respective Transfer Date, and the failure of such a policy to be in place on or after such Transfer Date is due to the actions or omissions of Seller or a prior servicer, Seller shall, no later than thirty (30) days after Seller's receipt of notification thereof, take all such actions as are necessary to cause such policy to be in force or to be reinstated by the applicable insurer.  If Seller fails to comply with the preceding sentence with respect to a Mortgage Loan, Purchaser shall notify the respective Agency and in the event that the Agency then requires Purchaser to repurchase such Mortgage Loan, Seller shall repurchase such Mortgage Loan from the Agency and repurchase the related Servicing Rights from Purchaser at the Servicing Rights Repurchase Price, in the manner set forth in Section 6.04(a) above.  At no time shall Purchaser be made to advance funds to reinstate any Primary Mortgage Insurance Policy or pass through to the Agency for any losses due to reasons stated in this subsection.  If Purchaser is notified of a rescission of the Primary Mortgage Insurance Policy, Seller shall reimburse Purchaser for any amounts due within fifteen (15) Business Days of receipt of request for reimbursement from Purchaser, provided such policy cannot be reinstated.

(c)    Upon the receipt of the Servicing Rights Repurchase Price and the repurchase or make whole price or in the event of any other repurchase of Servicing Rights required under this Agreement, Purchaser shall promptly take all reasonable steps to effect the reconveyance of any repurchased Mortgage Loan, including all documents and information related to such Mortgage Loan that were provided to Purchaser in connection with its purchase of such Servicing Rights hereunder, to Seller or its designee.

(d)    If it is discovered after a Sale Date that there is a breach of the covenants, representations or warranties contained in Section 3.01(v) with respect to a Mortgage Loan, then Purchaser shall promptly notify Seller and Seller shall, at Purchaser's option, within ten (10) Business Days following Seller's receipt of such notice, repurchase the Servicing Rights for the related Mortgage Loan and pay to Purchaser, by wire transfer of immediately available funds, the related Servicing Rights Repurchase Price for such Servicing Rights.  In addition, Seller shall pay to Purchaser all actual and reasonable out-of-pocket

costs and expenses (including but not limited to overnight courier charges) borne by Purchaser in connection with such breach, including, but not limited to, reasonable attorney's fees. If Seller discovers that there is a breach of the covenants, representations or warranties contained in Section 3.01(v) with respect to a Mortgage Loan, then Seller shall promptly notify Purchaser.

(e)    As between Purchaser and Seller, Seller shall be responsible and liable to each Agency for Agency-imposed fees and/or penalties related to a failure to comply with the Agency Guides during the period prior to the related Transfer Date, and for failure to comply with any timelines set forth in the Agency Guides after the related Transfer Date to the extent arising from (i) Seller's failure to service the related Mortgage Loans in accordance with Accepted Servicing Practices during the period prior to the related Transfer Date or (ii) any judicial or administrative judgments, orders, remediation plans or stipulations applicable to Seller's servicing of the Mortgage Loans, in each case other than to the extent such periods in excess of the required timelines after the related Transfer Date are increased by the untimely action or inaction of Purchaser not resulting from an occurrence described in clause (i) or (ii) above, and shall be responsible and liable to Purchaser if such amounts are recovered by an Agency from Purchaser, provided that nothing herein is intended to limit or otherwise impair the right of Seller to dispute with the Agency any responsibility or liability for such amounts claimed by such Agency. Purchaser shall use reasonable efforts to notify Seller within ten (10) Business Days of any Agency demands for such amounts and permit Seller to reasonably contest and/or appeal such demands. In the event that (i) Seller fails to pay such amounts to the respective Agency and does not advance such funds to Purchaser in advance of the due date for those amounts, and (ii) if applicable, due to the lack of a bifurcation agreement the Agency requires that such amounts nevertheless be paid by Purchaser, Seller shall by wire transfer of immediately available funds, reimburse Purchaser for any amounts paid by Purchaser. Such amounts will incur interest at an annual rate of the Prime Rate plus five percent (5.00%), or such lesser amount as may be required by applicable law from and after the date the amount is due to be paid to the Agency in the event that Seller fails to pay such amounts to the applicable Agency and does not advance such funds to Purchaser in advance of the required repurchase or make whole date as required herein.

(f)    The obligations of Seller and Purchaser under this Section 6.04 shall survive for the life of the related Mortgage Loans.

Section 6.05    Purchaser Due Diligence and Subsequent Rejection.

(a)    During the period prior to the respective Sale Date, Seller shall provide to Purchaser reasonable access, including electronic remote access, for the purpose of conducting Due Diligence reviews of the books, files and records relating to the Mortgage Loans and the related Servicing Rights. The purchase of the Servicing Rights on any Sale Date is further subject to the completion by Purchaser of confirmatory Due Diligence and (i) the reasonable determination by Purchaser that the books, records and accounts of Seller with respect to each Mortgage Loan are in order, (ii) the verification by Purchaser that the Mortgage Loan Schedule, the Data File and all other information provided by Seller is correct and consistent in all material respects with the transaction information received from Seller and the requirements of this Agreement, and (iii) the reasonable determination by Purchaser that the Mortgage Loans are in compliance with the applicable Agency Requirements relating to the underwriting and origination thereof and that the related loan documents in the Custodial File and the Mortgage File are not missing or defective in any material respect. Additionally, if as a result of Due Diligence, Purchaser determines in its sole discretion that the characteristics of the Mortgage Loans as a whole deviate materially from the characteristics set forth on the Mortgage Loan Schedule provided by Purchaser together with the related letter of intent, Purchaser shall not be obligated to purchase any of the related Servicing Rights and this Agreement shall be of no further effect with respect to such Servicing Rights.

36

(b)       As determined by Purchaser in its discretion, Purchaser shall have the right to reject any Servicing Rights for a Mortgage Loan, as determined by Purchaser in its reasonable discretion, (i) in which characteristics of such Mortgage Loan deviate in any material respect either from the characteristics agreed to by Seller and Purchaser or from the information previously provided by Seller to Purchaser regarding such Mortgage Loan on or prior to the related Sale Date, or (ii) such Mortgage Loan fails to comply with the applicable Agency Requirements relating to the underwriting and origination thereof or the related Mortgage Loan Documents in the Mortgage File are missing or defective in any material respect.  Seller shall not transfer to Purchaser any Servicing Rights related to Mortgage Loans which Purchaser has rejected.

(c)       The parties agree that any and all determinations made by Purchaser in connection with its due diligence review of Mortgage Loans, Servicing Rights and related books and records shall not be evidence that Seller has complied with any of its representations, warranties, or covenants under this Agreement.

ARTICLE VII
ADDITIONAL AGREEMENTS

Section 7.01      Publicity.

There will be no public announcement with respect to this Agreement and the transactions contemplated hereby without the express written consent of the parties; provided, however, that no party shall be restrained, after consultation with the other party, from making such disclosure if it shall be required as part of a contemplated merger, acquisition or equity transaction, advised by counsel that it is required by law or by the applicable regulations of any Agency, regulatory body, or securities exchange to be made.

Section 7.02      Assignment.

This Agreement is not assignable by Seller without the express written consent of Purchaser, which consent shall not be unreasonably withheld.  This Agreement is not assignable by Purchaser without the express written consent of Seller, which consent shall not be unreasonably withheld.  Notwithstanding the foregoing, in the event that either party merges into or is otherwise acquired by another entity, such party may assign its rights and obligations hereunder to the successor entity without obtaining consent from the other party.  This Agreement shall be binding upon and inure to the benefit of and be enforced by the respective successors and permitted assigns of the parties hereto.

Section 7.03      Entire Agreement.

This Agreement supersedes any prior agreement or understanding between the parties concerning the subject matter hereof.  If any conflict arises between any letter of intent and this Agreement, this Agreement shall control.

Section 7.04      Amendments, Changes and Modifications.

This Agreement may be amended, changed, modified, and altered only by an instrument in writing executed by Purchaser and Seller.

37

Section 7.05      Severability.

In the event any provision of this Agreement shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate nor render unenforceable any other provision hereof.  Such invalid or unenforceable provision shall be amended, if possible, in accordance with Section 7.04 in order to accomplish the purpose of this Agreement.  In the event that any provision of this Agreement is found to violate or directly contradict the terms of the Agency Guides, including any future modification thereof that affects the subject matter of this Agreement, the terms of the Agency Guides shall prevail.

Section 7.06      Attorney's Fees.

If any party shall bring suit or initiate arbitration proceedings against any other party as a result of any alleged breach or failure by such other party to fulfill or perform any covenants or obligations under this Agreement or in any deed, instrument or other document delivered hereunder, or to seek declaratory relief as to the rights or obligations of any party hereto, then in such event the prevailing party in such action shall, in addition to any other relief granted or awarded by the court, be entitled to judgment for reasonable attorneys' fees incurred by reason of such action and all out of pocket costs of suit and those incurred in the preparation thereof, at both trial and appellate levels.

Section 7.07      No Partnership.

Notwithstanding anything to the contrary in this Agreement, nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties.  The duties and responsibilities of Seller shall be rendered by Seller as an independent contractor and not as an agent of Purchaser.  Seller shall have full control of all of its acts, doings and proceedings relating to or requisite in connection with the discharge of its duties and responsibilities under this Agreement.

Section 7.08      Records.

Seller shall not, except in compliance with Applicable Requirements, without the prior written consent of Purchaser, destroy any Records or servicing file in its possession that relate to the Mortgage Loans, nor shall it instruct or permit any third party to destroy such Records.

ARTICLE VIII
MISCELLANEOUS PROVISIONS

Section 8.01      Waiver of Jury Trial, Venue; Governing Law.

EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF (EXCEPT FOR SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  THE PARTIES AGREE THAT ANY DISPUTE ARISING UNDER OR RELATING TO THIS AGREEMENT SHALL BE BROUGHT IN AND WILL BE RESOLVED EXCLUSIVELY IN EITHER UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK AND THE APPLICABLE APPELLATE COURTS FROM ANY APPEAL THEREOF.

118565008\V-2

EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL(S) WHO ARE IDENTIFIED HEREIN (SUBJECT TO EACH PARTY'S RIGHT TO IDENTIFY OTHER INDIVIDUALS AS SET FORTH IN SECTION 8.02) TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH ACTION, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.  SERVICE SHALL BE EFFECTUATED UPON MAILING A COPY OF ANY SUCH PROCESS BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED HEREIN.  NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

Section 8.02    Notices.

All notices or other communications required hereunder shall be in writing and shall be deemed duly given if delivered in person (with receipt therefore), if sent by reputable overnight delivery or courier service (e.g., Federal Express) providing for receipted delivery, or if sent by certified or registered mail, return receipt requested, postage prepaid, to the following address: (a) in the case of Seller, if by overnight courier, personal delivery or registered mail, Homespire Mortgage, 9711 Washingtonian Blvd., Suite 500, Gaithersburg, MD, 20878 Attention: William Napier, or such other address as may hereafter be furnished to the Purchaser in writing by Seller; and (b) in the case of Purchaser, if by overnight courier, personal delivery or registered mail to Seneca Mortgage Servicing LLC, 48 South Main Street, Newton, Connecticut, 06470, Attention: General Counsel, with a copy to legalnotices@senecaservicing.com, or such other address as may be furnished to Seller in writing by Purchaser.  Receipt of notice or other communication shall be conclusively established by either (i) return of a return receipt indicating that the notice has been delivered, or (ii) return of the letter containing the notice with an indication from the courier or postal service that the addressee has refused to accept delivery of the notice.

Section 8.03    Exhibits.

The Exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 8.04    General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular;

(b)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)    references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

118565008\V-2

(e)     the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(f)     the term "include" or "including" shall mean without limitation by reason of enumeration;

(g)     headings on the Articles and Sections in this Agreement are for reference purposes only and shall not be deemed to have any substantive effect; and

(h)     this Agreement shall be construed as having been jointly drafted by the parties hereto, and neither shall be deemed to be the drafting party for purposes of interpreting the language herein or otherwise resolving ambiguous terms.

Section 8.05     <u>Reproduction of Documents</u>.

This Agreement and all documents relating thereto, including, without limitation, (i) consents, waivers and modifications which may hereafter be executed, (ii) documents received by any party at the closing, and (iii) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by electronic means (including .pdf or .tiff files) or other similar process.  The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 8.06     <u>Solicitation</u>.

From and after the date of this Agreement, without the prior written consent and approval of Purchaser (which Purchaser may grant or withhold in its sole and absolute discretion), Seller shall not directly or indirectly solicit, by means of direct mail, telephone, internet or personal solicitation, the Mortgagors of any of the Mortgage Loans for any purpose, including, without limitation, (a) for purposes of prepayment or refinance or modification of such Mortgage Loans; or (b) for any financial services or products, including, but not limited to, (i) checking and savings accounts, certificates of deposit, safe deposit boxes, automatic teller machines, second mortgage loans, equity source accounts, personal loans and credit cards, and (ii) ordinary life, ordinary health, credit life, credit health, credit unemployment and any other forms of group or individual insurance coverages; it being understood and agreed that all rights and benefits relating to the direct solicitation of such Mortgagors and all attendant right, title and interest in and to the list of such Mortgagors and data relating to their Mortgage Loans shall be transferred to Purchaser pursuant hereto on such date (to the extent not previously transferred on the applicable Sale Date).  Seller shall exercise its best efforts, including the exercise of any available contractual remedies, to cause any Affiliate, Originator and/or Prior Servicer of the Mortgage Loans to refrain from engaging in any solicitation prohibited under clause (a) of this section with respect to Mortgage Loans and/or Mortgagors. Notwithstanding the foregoing, promotions undertaken by Seller that are directed to the general public at large, including, without limitation, mass mailings based on commercially acquired mailing lists, newspaper, radio and television advertisements, Mortgagors contacting the Seller directly without solicitation by the Seller or as otherwise approved by Purchaser in writing, shall not constitute a solicitation that is subject to this Section.

41

Section 8.07    Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one instrument.  Delivery of an executed counterpart of a signature page of this Agreement in Portable Document Format (PDF) or other electronically imaged form, or by facsimile transmission, shall be effective as delivery of a manually executed original counterpart of this Agreement.


[SIGNATURES ON FOLLOWING PAGE]

41

118565008\V-2

IN WITNESS WHEREOF, the parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

PURCHASER:

SENECA MORTGAGE SERVICING LLC

By: _____

Name: John W. Anderson II

Title: CEO/GC

SELLER

Homespire Mortgage

By: _____

Name: WILLIAM NAPIER

Title: EVP + CFO

42

118565008\V-2

**EXHIBIT 1-A**

**MORTGAGE FILE**

**Mortgage File**:

1. Copy of all documents held in the Custodial File

2. Certified true copy of the Mortgage /Deed of Trust with Riders/Addendums sent for recording

3. Final Mortgage/Deed of Trust (filed/recorded original)

4. Title Commitment

5. Final Title Policy

6. PMI Certificate, if applicable

**Servicing File**:

1. Loan History[1]

2. Hazard, Tax, etc.  Endorsement Change Letter[2]

3. Borrower's Goodbye letter and notification letters (hazard, flood, PMI, etc.)[3]

4. Tax Information Sheet including parcel number(s)

5. Hazard Insurance Declaration Page

6. FEMA Standard Flood Hazard Determination/Certification

7. Flood Insurance Declaration Page if applicable

8. 1st payment letter (signed by Borrower(s))

9. Initial Escrow Disclosure or Waiver

10. Final Application & Initial Application w/ signatures

11. Final Truth-In-Lending, with respect to loans with applications taken prior to October 3, 2015

12. Closing Disclosure, with respect to loans with applications taken on or after October 3, 2015

13. Uniform Underwriting Transmittal Form 1077/1008

14. Loan Prospector Feedback Certificate or DU Underwriter Findings

---

[1]For the months from origination to the applicable Transfer Date

[2]Within five (5) Business Days after each Transfer Date, Seller shall provide to Purchaser a sample of such notice or letter, together with a listing of each Mortgage Loan with respect to which such notice shall be sent

[3]Within five (5) Business Days after each Transfer Date, Seller shall provide to Purchaser a sample of such notice or letter, together with a listing of each Mortgage Loan with respect to which such notice shall be sent

Exhibit 1-A-1

15. Credit History: include credit reports, explanation of derogatory items and recent inquiries, other supporting documentation

16. IRS Form W-9

17. Mortgage or Rental Verifications with support docs

18. Income Verifications:

   A) VOEs

   B) Pay stubs, W2/1099s, documentation of verbal verifications

   C) Documentation for self-employed/commission income if applicable

   D) IRS Form 4506, 4506T or 8821 with IRS response

   E) Funds Verification for down payment, prepaid items, closing costs, financing cost, cash reserves

   F) VODs

   G) Account statements

   H) Supporting documentation (e.g. gift letters with transfer of funds documentation)

19. Concurrent Subordinate Mortgage if from same lender

20. Miscellaneous Documentation (e.g. proof of sale on previous residence, divorce, leases, etc.)

21. Sales Contract and all Addenda (fully executed) or Escrow Closing Instructions

22. Settlement Statement (HUD-1) with applicable certifications, with respect to loans with applications taken prior to October 3, 2015

23. Good Faith Estimate, with respect to loans with applications taken prior to October 3, 2015

24. Loan Estimate, with respect to loans with applications taken on or after October 3, 2015

25. Right of Rescission on refinances

26. Appraisal with all supporting information

27. Survey and/or waiver as applicable

28. Initial Disclosures including state specific disclosures and USA Patriot Act disclosure, and statement of Mortgagor confirming receipt

29. Borrower's Choice of Attorney Disclosure if applicable

30. Mortgagor correspondence

31. If applicable and available: termite report, structural engineer's report, water potability and septic certification

Exhibit 1-A-2

118565008\V-2

32. Copy of each instrument necessary to complete identification of any exception set forth in the exception schedule in the title policy, i.e., map or plat, restrictions, easements, sewer agreements, home association declarations, etc.

33. Photograph of Mortgaged Property

34. All other supporting documents and/or disclosures reasonably necessary to service the Mortgage Loans

Exhibit 1-A-3

118565008\V-2

**EXHIBIT 1-B**

**CUSTODIAL FILE**

1.  Original Mortgage Note (or deed of trust) bearing all necessary endorsements or lost note affidavit executed by Seller delivered in accordance with Agency Requirements.

2.  Original Mortgage, with evidence of recording thereon or a certified true and correct copy of the Mortgage sent for recordation.

3.  Originals of any instruments that modify the terms and conditions of the Mortgage Note - such as a modification agreement, or an ARM rider, etc., with evidence of recording thereon.

4.  Guaranty, chattel mortgage or equivalent document executed in connection with the Mortgage.

5.  Original recorded Assignment (if non-MERS) or a certified true and correct copy of the Assignment sent for recordation and all intervening assignments, with evidence of recording thereon.

6.  Copy of the notarized power of attorney, if applicable.

7.  Copy of any name affidavit, if applicable.

8.  Any special documentation that the Agency specifies for a particular type of mortgage.

9.  The original final title policy or a certified true copy of the title commitment.

10.  All other documents required to be included as part of the Custodial File by the Agency.

Exhibit 1-B-1

**EXHIBIT 2**

**CONTENTS OF MORTGAGE LOAN SCHEDULE**

| No | Field Name | Field Description |
|---|---|---|
| 1 | Loan_Num | Loan Number/ID |
| 2 | Orig_Bal | Original Loan Amount |
| 3 | Note_Type | To distinguish Conventional, Conventional with PMI, FHA, etc |
| 4 | UPB | Current Principal Balance |
| 5 | Orig_PI | Original Monthly P&I |
| 6 | PI_Pmt | Current Monthly P&I Payment |
| 7 | TI_Pmt | T&I Constant (added to monthly payment) ($) |
| 8 | Total_Pmt | Total Payment (T&I + P&I) |
| 9 | Escrow_Flag | Paying Escrow or Not |
| 10 | Escrow_Bal | Escrow Balance (current total) |
| 11 | Escrow_Adv_Bal | Escrow Advance Balance |
| 12 | Orig_Term | Amortization Term |
| 13 | Balloon_Flag | Balloon Flag |
| 14 | PRODUCTCD | Loan Product Type (5/6 ARM, Fixed 30, Balloon 15/30….etc) |
| 15 | First_Pmt_Dt | First Payment (Due) Date |
| 16 | Int_Paid_To_Dt | Paid Through Date |
| 17 | Maturity_Dt | Maturity Date |
| 18 | Orig_Dt | Origination Date |
| 19 | Orig_Rate | Original Note Rate |
| 20 | Note_Rate | Current Interest Rate |
| 21 | Sfee | Serving Fee |
| 22 | Lender_Paid_PMI | LPMI Fee/premium (if any) |
| 23 | Pass through rate | Pass thru |
| 24 | State | Property State |
| 25 | Zip_Code | Property Zip Code |
| 26 | Prop_Type | Property Type (e.g. SFD, Condo, etc.) |
| 27 | Lien_Type | Lien Position |
| 28 | Loan_Purpose | Loan Purpose |
| 29 | Owner_Occup | Occupancy Type Code |
| 30 | Doc_Type | Documentation Type |
| 31 | Prepay_Penalty_Term | Prepayment Penalty Period/Term |

Exhibit 2-1

| 32 | Orig_Non_Amort_Term | Interest Only period (if any, in months) |
|---|---|---|
| 33 | IO_Flag | Interest only Indicator |
| 34 | Fcl_Flag | Foreclosure Flag |
| 35 | Bk_Flag | Bankruptcy Flag |
| 36 | Data_Dt | Data As of Date |
| 37 | IO_Strip_Security | Net Service Sold into an IO Security (if Applicable) |
| 38 | ARM_Margin | Margin (%) |
| 39 | ARM_Life_Floor | Life Floor (%) |
| 40 | ARM_Life_Ceiling | Life Ceiling (%) |
| 41 | ARM_Index | Index type (e.g. 6 month LIBOR, 1 yr. CMT) |
| 42 | ARM_Init_Pd_Cap | Initial Rate Cap (%) |
| 43 | ARM_Pd_Rate_Cap | Periodic Rate Cap (%) |
| 44 | ARM_Pd_Rate_Floor | Periodic Rate Floor (%) |
| 45 | Arm_Life_Cap | Life Cap (%) |
| 46 | ARM_First_Rate_Chg_Dt | First Interest Rate Adjustment Date |
| 47 | ARM_Nxt_Rate_Chg_Dt | Next Interest Adjustment Date |
| 48 | ARM_Nxt_Pmt_Chg_Dt | Next P&I Adjustment Date |
| 49 | ARM_NegAm_Flag | Negative Amortization (yes or no) |
| 50 | Mod Type | Type of Loan Modification |
| 51 | Mod Complete Date | Date Loan Modification Completed |
| 52 | Custodian | Name of Custodian |
| 53 | HARP Flag | Designates HARP loans |
| 54 | Investor | Fannie/Freddie |
| 55 | Investor Loan Number | Fannie/Freddie Loan ID |
| 56 | GFEE | Gross Service Fee |
| 57 | Net Service Fee | SFEE - GFEE |
| 58 | FICO | Credit Score |
| 59 | Property Address | Borrower's property address |
| 60 | State | State of property |
| 61 | MI Company | Name of company providing mortgage insurance |
| 62 | MI % | % of mortgage insurance |
| 63 | Channel | Retail, Wholesale, Correspondent |
| 64 | Remit Type | AA, SS, SA |
| 65 | Fannie/Freddie Pool # | Identification # of the investor pool |
| 66 | Completion Escrow | Completion Escrow Percentage of UPB |

Exhibit 2-2

| 67 | Purchase Price Percentage | Purchase Price Percentage |
|----|---------------------------|---------------------------|
| 68 | Purchase Price | Purchase Price |
| 69 | Number of Loans | Total # of Loans |
| 70 | Total Unpaid Principal Balance | Total UPB |
| 71 | Total Purchase Price | Total Purchase Price |

Exhibit 2-3

118565008\V-2

**EXHIBIT 3**

- All purchases of MSR will be conventional Fannie Mae and Freddie Mac loans

- No more than 25% of the loans will have a FICO score lower than 700 with the average FICO score of loans to be 740 or greater.

- No more than 5% of the loans will have a FICO of less than 620

- No more than 25% of the loans will have an LTV greater than 90% with the average pool LTV being less than 80% or less.

- No more than 10% of the pool will be comprised of special programs such as Home Ready/ Home Possible

- All purchased loans to be originated after 4/1/2020.

- At no time will assets be purchased in PR, GU or the VI.

- No more than 10% of the loans will be purchased with a UPB less than $100,000

Exhibit 3-1

118565008\V-2

**EXHIBIT 4**

**FORM OF LIMITED POWER OF ATTORNEY**

This LIMITED POWER OF ATTORNEY, dated as of _____ __, 202__ (this "Limited Power of Attorney"), is hereby granted to _____, a _____ ("**Grantee**"), by _____, a **_____** ("**Grantor**").

W I T N E S E T H:

WHEREAS, Grantor is a party to that certain _____ (the "Agreement") dated as of _____ __, 202__, by and between Grantee and Grantor, which provides for, among other things, Grantor to sell, transfer and convey all of its right, title and interest in and to the Servicing Rights described within the Agreement. In connection with the sale of the Servicing Rights, Grantee will assume the servicing responsibilities and obligations with respect to Mortgage Loans identified within the Agreement.

NOW, THEREFORE, pursuant to the Agreement and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor hereby agrees as follows:

1.      Definitions.  Defined terms used herein and not otherwise defined shall have the meanings set forth in the Agreement.

2.      Limited Power of Attorney.  For purposes of transferring ownership of the Servicing Rights to Grantee and to effectuate the efficient servicing of the Mortgage Loans, Grantor names, constitutes and appoints Grantee as its duly authorized agent and attorney-in-fact, with full power and authority in its name, place and stead to (i) execute such documents as are necessary to initiate and/or pursue foreclosure or other legal actions with respect to the Mortgage Loans; (ii) execute such deeds and other documents as are necessary to sell or convey real and personal property securing the Mortgage Loans, including, but not limited to, signing deeds to convey real property acquired through foreclosure of a Mortgage Loan; (iii) execute documents and instruments necessary to release any and all mortgages, security instruments, liens, security interests or related documents with respect to the Mortgage Loans; (iv) execute documents and instruments necessary to release all obligations under any promissory note or related documents with respect to the Mortgage Loans; (v) execute documents and instruments necessary to assign or transfer any Mortgage Note, including, but not limited to, any allonge or endorsement related thereto; (vi) execute documents and instruments necessary to sign subordination agreements and consent to easements related to the Mortgage Loans; (vii) execute such documents as are necessary to assign the Mortgage Loans (including, without limitation, assignments of mortgages from Grantor to MERS, Freddie Mac, Fannie Mae, or other applicable Person); (viii) endorse checks and other payment instruments that are payable to the order of Grantor and that have been received by Grantee from Mortgagors or any insurer in respect of insurance proceeds related to any Mortgage Loan; and (ix) execute such other documents as may be necessary or appropriate to enable Grantee to carry out its servicing and administrative duties with respect to the Mortgage Loans.

3.      Waivers and Amendments.  This Limited Power of Attorney may be amended, modified, supplemented or restated only by a written instrument executed by Grantor.  The terms of this Limited Power of Attorney may be waived only by a written instrument executed by the party waiving compliance.

4.      Headings.  The headings in this Limited Power of Attorney are for convenience of reference only and shall not define, limit or otherwise affect any of the terms or provisions hereof.

Exhibit 4-1

118565008\V-2

5.    <u>Successors and Assigns</u>.  This Limited Power of Attorney shall inure to the benefit of, and be binding upon, Grantor and Grantee and their respective successors and assigns; <u>provided</u>, <u>however</u>, that Grantee shall not assign any of the rights under this Limited Power of Attorney (except by merger or other operation of law) without the prior written consent of Grantor, and any such purported assignment without such consent shall be void and of no effect.

6.    <u>Governing Law</u>.  This Limited Power of Attorney shall be governed by and construed and enforced in accordance with the laws of the State of New York, without regard to any conflicts of law rules that might apply the Laws of any other jurisdiction.

Until this Limited Power of Attorney is revoked as set forth below, all parties dealing with said attorney-in-fact (individually or collectively) in connection with the above described matters may fully rely upon the power and authority of said attorney-in-fact to act for and on behalf of the undersigned, and in its name, place and stead, and may accept and rely on all documents and agreements entered into by said attorney-in-fact pursuant to the powers listed herein.

As between Grantor and Grantee, this Limited Power of Attorney shall be effective as of the date hereof and shall remain in full force and effect thereafter until the earlier of (1) a written notice of revocation hereof shall have been executed by Grantor; provided, Grantor shall not be permitted to terminate this Limited Power of Attorney for a period of one (1) year beginning on the date hereof; or (2) Grantee's resignation or removal as servicer with respect to the Mortgage Loans.  The expiration or revocation of the period of agency hereunder shall in no way affect the validity of any actions of said attorney-in-fact during said period.

[*signature page follows*]

Exhibit 4-2

118565008\V-2

IN WITNESS WHEREOF, the undersigned has executed and delivered this Limited Power of Attorney as of the date first above written.

**Grantor:**

By: _____

Name: _____

Witness: _____

Title: _____

Witness: _____

By: _____

Name: _____

Title: _____

Attest: _____

## CORPORATE ACKNOWLEDGMENT

State of [                    ]

County of [                    ]

On_____ __, 201__, before me, the undersigned Notary Public, personally appeared _____, an _____ of _____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose names is subscribed to the within instrument and acknowledged to me that he or she executed the same in his or her authorized capacity, and that by his or her signature on the instrument the entity, on behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

_____

Notary Public

My commission expires:_____

Exhibit 4-3

118565008\V-2

## BILL OF SALE

For good and valuable consideration, on this 30th day of November, 2022(the "Sale Date"), subject to the terms of the Bulk Servicing Rights Purchase and Sale Agreement (the "Agreement"), dated as of November 30, 2022, by and between Homespire Mortgage (the "Seller") and Seneca Mortgage Servicing LLC (the "Purchaser"), Seller does hereby sell to Purchaser, without representation, warranty or recourse, except as otherwise expressly provided in the Agreement, all of the right, title and interest of Seller in and to the Servicing Rights attributable to the Mortgage Loans identified on the Mortgage Loan Schedule attached hereto as Schedule A.

This Bill of Sale shall be governed by, and construed in accordance with, the laws of the State of New York, except to the extent preempted by federal law.

Capitalized terms used herein but not otherwise defined shall have the meanings provided in the Agreement.

Homespire Mortgage

By:

Name: WILLIAM NAPIER

Title: EVP + CFO

**EXHIBIT 6**

**INTERIM SERVICING AGREEMENT**

**THIS INTERIM SERVICING AGREEMENT** (as the same may be amended, restated, modified, substituted or extended from time to time, the **"Interim Servicing Agreement"**) is entered into as of December 1, 2022, by and between **SENECA MORTGAGE SERVICING LLC**, a Delaware limited liability company ("**Purchaser**") and **HOMESPIRE MORTGAGE** a Maryland corporation ("**Seller**").

**RECITALS**

A.      Purchaser and Seller have entered into that certain Bulk Servicing Rights Purchase and Sale Agreement dated as of November 30, 2022 (as the same may be amended, restated, modified, substituted or extended from time to time, the "**Agreement**").  Seller is engaged as an independent contractor in the business of servicing loans and performs servicing functions for Seller and various investors.

B.      Pursuant to the Agreement, Seller will sell, assign and transfer to Purchaser on each Sale Date all of Seller's right, title and interest in and to the Servicing Rights of the transferred Mortgaged Loans, and all related rights thereto.

C.      The Agreement provides that, on each Sale Date, the parties shall enter into an Interim Servicing Agreement regarding (i) Seller's obligations to perform servicing functions with respect to the Mortgage Loans for a temporary period after each Sale Date and until either each related Transfer Date or all the obligations thereunder are fulfilled, and (ii) the compensation to be paid by Purchaser to Seller for the performance of such function.

D.      The terms and provisions of this Interim Servicing Agreement are in addition to any rights and obligations of the parties pursuant to the Agreement;

E.      Any capitalized term used herein and not defined shall have the meaning set forth in the Agreement.

F.      Subject to applicable requirements, Purchaser desires to engage Seller as an independent contractor to perform, for the Interim Period (as defined below) after each Sale Date, such servicing functions described herein, and Seller desires to accept such engagement pursuant to the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** for and in consideration of the mutual covenants and agreements herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Purchaser and Seller agree as follows:

**Section 1.  Definitions**.

(a)      "**Ancillary Income**" shall mean all income derived from the Mortgage Loans not required by the Agency Guides to be passed through to the Agency or the Mortgagors, other than the Servicing Income, including but not limited to, the Float Benefit, prepayment charges, late charges, fees received with respect to checks or bank drafts returned by the related bank for non-sufficient funds, assumption fees, optional insurance administrative fees and all other incidental fees and charges.

(b)      "**Float Benefit**"  shall mean all benefit, not due to the Agency or the Mortgagors under the Agency Guides,  related to the Escrow Accounts and the Custodial Accounts, as applicable, with respect to the Mortgage Loans during the Interim Period.

Exhibit 6-1

118565008\V-2

(c)    "**Interim Remittance Instructions**" shall mean the instructions attached hereto as Schedule A.

(d)    "**Records**" shall include work files, individual accounts, books, documents, files, correspondence, related information or data of any kind relating to the Servicing Rights and the records created by Purchaser or Seller in connection with the Servicing Rights during the Interim Period (as defined below).

(e)    "**Servicing Income**" shall mean the gross servicing fees, relating to the Mortgage Loans due from the Agency net of the guaranty fee payable to the Agency.

(f)    "**Subservicer**" shall mean any Person that services Mortgage Loans on behalf of Seller and is responsible for the performance of a substantial portion of the material servicing functions required to be performed by Seller under this Interim Servicing Agreement or the Agreement.

(g)    "**Subservicing Agreement**" shall mean each agreement providing for the servicing of any of the Mortgage Loans by a Subservicer.

## Section 2.  Term.

The term of this Interim Servicing Agreement, except as provided otherwise herein, shall commence as of the close of business on each Sale Date and shall terminate with respect to each Mortgage Loan on each applicable Transfer Date, except for any indemnification or other obligations under the Agreement that are expressly intended to survive the transfer and sale of the Servicing Rights to Purchaser (which shall be disregarded when making the determination as to whether Seller's obligations hereunder and under the Agreement are deemed to be complete) (the "**Interim Period**").

## Section 3.  Relationship.

During the Interim Period:

(a)    Seller shall observe and perform all covenants, undertakings, obligations, representations and warranties required to be observed or performed pursuant to the Agreement and the Agency Guides. Seller shall at all times service the Mortgage Loans in accordance with Accepted Servicing Practices and as though Seller owned the Servicing Rights.

(b)    Seller shall use its best efforts to collect payments due from obligors under the Mortgage Loans as they become due, including:

   (i)    principal;

   (ii)    interest;

   (iii)    amounts for hazard, flood, private mortgage and other insurance premiums, payments with regard to taxes, legal fees, and foreclosure costs, as well as repayment of amounts advanced by Seller and/or Seller on behalf of the mortgagor;

   (iv)    late charges;

   (v)    modification fees;

   (vi)    assumption fees;

Exhibit 6-2

118565008\V-2

(vii)    bad check charges; and

(viii)    and any other amount due under the Mortgage Loans.

(c)    Seller shall remit to the Agency the remittances due for the Interim Period.  Seller shall make any necessary deposits to or withdrawals from each related Custodial Account and Escrow Account in accordance with Section 4 hereof.

(d)    Seller shall comply with the Interim Remittance Instructions.  Seller shall deduct from each monthly payment received from each Mortgagor, an amount equal to one-twelfth of the annual Servicing Income payable to Purchaser pursuant to the Agency requirements.  On or before the tenth (10th) Business Day of each month, Seller shall remit to Purchaser the Servicing Income pertaining to the Agency's servicing, net of the Interim Service Fee and Ancillary Income described in Section 6 herein.  Along with such remittances, Seller shall provide a report, reasonably acceptable to Purchaser, substantiating the amount remitted.   All Funds remitted under this section shall be sent by wire transfer of immediately available funds.

Seller shall remit all payments applicable to principal and interest, including without limitation prepayments of principal, less the Servicing Income, to the Agency in accordance with the Agency Guides and shall make all principal and interest Advances to the Agency pursuant to the Agency Guides.

(e)    Seller shall prepare and deliver to the Agency all reports relating to the Mortgage Loans that are required pursuant to the Agency Guides.  All such reports shall be delivered in a timely manner in compliance with the applicable Agency Guides.  Upon written request, Purchaser shall be entitled to review such reports prior to the delivery of such reports to the Agency, and Seller shall reasonably cooperate with Purchaser in the event that Purchaser desires that a report be amended; provided, however, that such reviews shall not unduly interfere with Seller filing its reports in a timely manner as required by the Agency Guides.   Seller will provide Purchaser with copies of any computer reports or a monthly data file, as reasonably requested.

(f)    Seller shall not, without the prior written consent of Purchaser, destroy any Records or servicing file in its possession that relate to the Mortgage Loans, nor shall it instruct or permit any third party to destroy such Records.

(g)    Purchaser shall have the right to inspect and audit Seller's activities, hereunder, during normal business hours on Business Days; provided, that, any such inspection and audit shall not unreasonably interfere with Seller's activities hereunder and that reasonable notice is given.  Seller will reasonably cooperate with Purchaser and to make available such files and Records that Purchaser may reasonably request.

## Section 4.  Related Custodial Accounts and Escrow Accounts.

During the term of this Interim Servicing Agreement, with respect to each Mortgage Loan hereunder, Seller shall maintain Custodial Accounts and Escrow Accounts as is required by the terms of the Agency Guides.  During the term of this Interim Servicing Agreement, the Custodial Accounts and Escrow Accounts shall be administered on behalf of Purchaser in the depository institution previously utilized by Seller; provided, however, that all Custodial Accounts and Escrow Accounts must at all times be on deposit in an institution that meets the requirements of the Agency pursuant to the Agency Guides.  On each Business Day during the term of this Interim Servicing Agreement, Seller shall deposit in the appropriate Custodial Account and Escrow Account all collections received by it with respect to the Mortgage Loans.  Seller shall be responsible for all advances required in connection with the various Escrow Accounts, and shall be responsible for prompt payment of all taxes, assessments, and hazard insurance premiums, private mortgage insurance premiums and premiums for fire, windstorm, flood and

Exhibit 6-3

earthquake insurance policies during the term of this Interim Servicing Agreement.  If adequate funds are not held in the Escrow Accounts at loan level to pay, when due, assessments, real estate taxes, or insurance premiums, or similar charges on any property securing a Mortgage Loan, Seller shall advance sufficient funds to cover any such deficiency in a manner to ensure payment of such taxes or insurance premiums prior to the time at which a penalty for late payment would be assessed.  Seller shall transfer the balances of the Custodial Accounts and Escrow Accounts to Purchaser following the mutual agreement of Seller and Purchaser of the conversion totals and balances of the accounts as of each Transfer Date; provided that in no event shall the transfer of such balances occur more than three (3) Business Days following each such Transfer Date.

**Section 5.  Defaulted Mortgage Loans**.

During the term of this Interim Servicing Agreement, Seller agrees to take the following actions as independent contractor with respect to any defaulted Mortgage Loans:

(a)     Seller shall, in accordance with the Accepted Servicing Practices, act to institute foreclosure proceedings for and on behalf of Purchaser or to administer collection or other servicing activities on Mortgage Loans that go into foreclosure, bankruptcy or litigation.  Seller shall promptly notify Purchaser of any foreclosure proceedings.

(b)     Seller shall, to the extent required by the applicable Agency Guides, promptly take such actions as are appropriate with regard to delinquent payments for Mortgage Loans serviced pursuant to this Interim Servicing Agreement, or with regard to the foreclosure or other acquisition of the property securing any such Mortgage Loan, the transfer of such property to the Agency or private mortgage insurance company and the collection of any applicable mortgage insurance and, pending completion of such steps.

**Section 6.  Interim Servicing Fee**.

(a)     Purchaser shall pay to Seller an Interim Servicing Fee as set forth in Section 6(b) hereof, and Seller will carry out all of its obligations hereunder at its own expense, except as otherwise specifically provided herein.

(b)     The monthly Interim Servicing Fee payable to Seller, for the full term of this Interim Servicing Agreement, shall be equal to [__] dollars ($[___.00]) per Mortgage Loan per month (the "**Interim Servicing Fee**") pro-rated for any partial month.  Pursuant to the Interim Remittance Instructions, Seller shall remit the Servicing Income to Purchaser on or before the tenth (10th) Business Day of each month net of the monthly Interim Servicing Fees.  Seller is only entitled to the Interim Servicing Fee and Ancillary Income from each Sale Date to each respective Transfer Date of each Mortgage Loan.  Seller will be responsible for any payoff and curtailment interest costs from each Sale Date to each related Transfer Date.  Purchaser will be responsible for payoff and curtailment interest costs after each Transfer Date.  During the Interim Period, Seller shall make appropriate Advances associated with the Mortgage Loans, if applicable, along with the regular remittance due to the Agency pursuant to the Agency Guides.  Purchaser shall reimburse Seller for such Advances in accordance with Section 5.06 of the Agreement.

**Section 7.  Insurance**.

At all times while this Interim Servicing Agreement is in force and effect, Seller shall maintain at its own expense policies of fidelity, theft, forgery and errors and omissions insurance in such amounts as are required by the Agency Guides.

Exhibit 6-4

118565008\V-2

**Section 8.  Representations of Seller**.

Seller hereby represents and warrants to and covenants with Purchaser (such representations and warranties to be true and correct throughout the term of this Interim Servicing Agreement) as follows:

(a)     Seller is duly organized, validly existing, and in good standing under the laws of the state under whose laws it is organized.  Seller is qualified or registered to transact business in each jurisdiction in which the ownership of property or the conduct of its business requires such qualification or registration.

(b)     Seller has the power, authority and legal right to enter into and to perform its obligations under this Interim Servicing Agreement and to perform each of the obligations required of it hereunder, and this Interim Servicing Agreement and any document or instrument to be delivered to Purchaser by Seller pursuant hereto has been duly authorized, executed and delivered.

(c)     This Interim Servicing Agreement and any documents or instruments now or hereafter executed and delivered to Purchaser by Seller pursuant to this Interim Servicing Agreement (or shall, when delivered to Purchaser by Seller) constitute valid and legally binding obligations of Seller enforceable against Seller in accordance with their respective terms, except as may be limited by or subject to any bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally.

(d)     Seller is an approved Agency seller and servicer.

(e)     The consummation of the transactions contemplated by this Interim Servicing Agreement will not result, in any material respect: (i) in the breach of any term or provision of the Agreement or Seller's organizational documents; (ii) in the breach of any term or provision of, or conflict with or constitute under, any agreement, indenture or loan or credit agreement or other instrument to which Seller or its property is subject; or (iii) result in the violation of any law, rule, regulation, order, judgment or decree to which Seller or its property is subject.

(f)     Seller has in full force and effect all insurance necessary to perform its obligations hereunder, including without limitation: (i) an adequate errors and omissions policy or policies satisfying the requirements of each Agency, and other governmental entities or other third parties with respect to its operations; and (ii) a standard mortgage banker's blanket bond.

(g)     Neither this Interim Servicing Agreement nor any information, statement, tape, diskette, report, form, or other document furnished or to be furnished pursuant to this Interim Servicing Agreement or in connection with the transactions contemplated hereby contains or will contain any untrue statement of material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.

Seller will indemnify and hold harmless Purchaser and its directors, officers, agents and employees against any and all actual damages, including without limitation reasonable out-of-pocket attorneys' fees, resulting from or arising out of or in connection with any act or omission of Seller or its directors, officers, agents, subagents, independent contractors, employees relating to (i) any breach of the representations and warranties made by Seller in this Interim Servicing Agreement, or any failure by Seller to perform its obligations under this Interim Servicing Agreement, (ii) Seller's failure to service a Mortgage Loan prior to each applicable Transfer Date in accordance with Accepted Servicing Practices or (iii) the transfer of servicing provided for in this Interim Servicing Agreement.  Seller's indemnity obligations will survive the termination of this Interim Servicing Agreement for the life of the Mortgage Loans.

**Section 9.  Representations of Purchaser**.

Purchaser hereby represents and warrants to and covenants with Seller (such representations and warranties to be true and correct throughout the term of this Interim Servicing Agreement) as follows:

Exhibit 6-5

118565008\V-2

(a)    Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Purchaser is duly licensed and qualified to operate in every jurisdiction where it transacts business.

(b)    Purchaser has the power, authority and legal right to enter into and perform this Interim Servicing Agreement, and this Interim Servicing Agreement and any document or instrument to be delivered by Purchaser to Seller pursuant hereto has been duly authorized, executed and delivered.

(c)    This Interim Servicing Agreement and any document or instruments now or hereafter executed or delivered by Purchaser to Seller pursuant to this Interim Servicing Agreement (or shall, when delivered by Purchaser to Seller) constitute valid and legally binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms except as may be limited by or subject to any bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally.

(d)    The consummation of the transactions contemplated by this Interim Servicing Agreement will not result, in any material respect: (i) in the breach of any term or provision of the Interim Servicing Agreement or the organizational documents of Purchaser; or (ii) result in the violation of any law, rule, regulation, order, judgment or decree to which Purchaser is subject.

## Section 10.  Confidentiality.

Each party agrees that it shall comply with all applicable laws and regulations regarding the privacy or security of Mortgagor information and shall maintain appropriate safeguards to ensure the security and confidentiality of all Mortgagor information, to protect against anticipated threats or hazards to the security or integrity of Mortgagor information and to protect against unauthorized access to or use of Mortgagor information.  All Mortgagor information that is transmitted over any external network shall be sent in accordance with Applicable Requirements.

## Section 11.  Use by Seller of a Subservicer.

Seller, as servicer, may arrange for the subservicing of any Mortgage Loan by a Subservicer pursuant to a Subservicing Agreement; provided that, notwithstanding the provisions of any Subservicing Agreement, any of the provisions of this Interim Servicing Agreement or the Agreement relating to agreements or arrangements between Seller or a Subservicer or reference to actions taken through Seller or otherwise, Seller shall remain obligated and liable to Purchaser and its successors and assigns for the servicing and administration of the Mortgage Loans in accordance with the provisions of this Interim Servicing Agreement and the Agreement without diminution of such obligation or liability by virtue of such Subservicing Agreements.  All actions of each Subservicer performed pursuant to the related Subservicing Agreement shall be performed as an agent of Seller with the same force and effect as if performed directly by Seller.

## Section 12.  Miscellaneous.

(a)    To the extent reasonably possible, the parties hereto shall cooperate with and assist each other, as requested, in carrying out the intent of this Interim Servicing Agreement and they shall comply with all applicable laws governing the Mortgage Loans, the Servicing Rights and the Agency Requirements. Seller and Purchaser each agree to execute and deliver to the other such reasonable and appropriate additional documents, agreements or information, including but not limited to any powers of attorney, as may be necessary to affect the purposes of this Interim Servicing Agreement.

(b)    All notices, consents and other communications pertaining to this Interim Servicing Agreement shall be given and shall be deemed received in accordance with Section 8.02 of the Agreement.

Exhibit 6-6

118565008\V-2

(c)      This Interim Servicing Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(d)      This Interim Servicing Agreement is not assignable by the parties hereto, and no assignment or other transfer, hypothecation or encumbrance thereof by any party shall confer any rights in any other person without the prior written approval of the other party.

(e)      This Interim Servicing Agreement, when read with the applicable provisions of the Agreement, contains the entire agreement between the parties hereto and supersedes all prior and contemporaneous agreements, understandings and discussions, whether written or oral, among the parties relating to the transactions contemplated herein.  This Interim Servicing Agreement cannot be modified in any way except by written agreement signed by both parties.

(f)      Except as otherwise provided for herein, neither any failure nor delay on the part of the parties hereto in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall a single or partial exercise thereof preclude any other or further exercise or the exercise of any other right, power or privilege.

(g)      Notwithstanding anything to the contrary in the Agreement, nothing herein contained shall be deemed or construed to create a partnership or joint venture between the parties.  The duties and responsibilities of Seller shall be rendered by Seller as an independent contractor and not as an agent of Purchaser.  Seller shall have full control of all of its acts, doings and proceedings relating to or requisite in connection with the discharge of its duties and responsibilities under this Interim Servicing Agreement.

(h)      All headings used in this Interim Servicing Agreement are for reference purposes only and shall not be deemed to have any substantive effect.

(i)      **EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY, WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY OF ANY DISPUTE ARISING UNDER OR RELATING TO THIS INTERIM SERVICING AGREEMENT AND AGREES THAT ANY SUCH DISPUTE SHALL BE TRIED BEFORE A JUDGE SITTING WITHOUT A JURY.**

(j)      **THIS INTERIM SERVICING AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF (EXCEPT FOR SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).  THE PARTIES AGREE THAT ANY DISPUTE ARISING UNDER OR RELATING TO THIS INTERIM SERVICING AGREEMENT SHALL BE BROUGHT IN AND WILL BE RESOLVED EXCLUSIVELY IN EITHER UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR IN THE SUPREME COURT OF THE STATE OF NEW YORK, COUNTY OF NEW YORK AND THE APPLICABLE APPELLATE COURTS FROM ANY APPEAL THEREOF.**

(k)      **EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL(S) WHO ARE IDENTIFIED IN THE AGREEMENT (SUBJECT TO EACH PARTY'S RIGHT TO IDENTIFY OTHER INDIVIDUALS AS SET FORTH IN THE AGREEMENT) TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH ACTION, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT.  SERVICE SHALL BE EFFECTUATED UPON MAILING A COPY OF ANY SUCH PROCESS BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED HEREIN.  NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.**

(l)      This Interim Servicing Agreement may be executed in any number of counterparts, each of which shall be deemed an original.  The Parties agree that this Interim Servicing Agreement and signature

Exhibit 6-7

pages thereof may be transmitted between them by facsimile and that faxed signatures may constitute original signatures and that a faxed signature page containing the signature of an authorized individual (faxed or original) is binding on the respective Parties.


IN WITNESS WHEREOF, the parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

PURCHASER:

SENECA MORTGAGE SERVICING LLC

By: _____

Name: John W. Anderson II
Title: CEO/GC


SELLER

HOMESPIRE MORTGAGE

By: _____
Name: WILLIAM NAPIER
Title: EVP + CFO

Exhibit 6-8

118565008\V-2

**Schedule A to Bill of Sale**

MORTGAGE LOAN SCHEDULE

[See Attached]

118565008\V-2

**EXHIBIT 7**

**SERVICING TRANSFER INSTRUCTIONS**

Exhibit 6-2

118565008\V-2